737 So.2d 390 (1998)
Bernice PEARSON, Appellant,
v.
COLUMBUS AND GREENVILLE RAILWAY COMPANY, A Mississippi Corporation, Appellee.
No. 96-CA-00984COA.
Court of Appeals of Mississippi.
December 8, 1998.
Rehearing Denied March 9, 1999.
*392 Pat M. Barrett Jr., Lexington, for Appellant.
W. Dean Belk, Indianola, for Appellee.
Before BRIDGES, C.J., and DIAZ and SOUTHWICK, JJ.
SOUTHWICK, J., for the Court:
¶ 1. This is the second appeal in a personal injury suit brought by Bernice Pearson against the Columbus & Greenville Railway. The suit arose from a 1991 grade crossing accident in which Mrs. Pearson ran into a freight car that was part of a stopped train owned and operated by the Railway. Summary judgment was granted to the Railway in 1993, based on federal preemption of all claims. In the first appeal, though agreeing that Mrs. Pearson's claims regarding the adequacy of warnings of the grade crossing were potentially preempted by federal standards, this Court remanded in order that certain factual issues regarding preemption could be addressed. Left unaffected by our ruling were claims regarding the visibility of the stopped freight car.
¶ 2. After remand, the trial court found that the factual predicates existed for federal preemption of the claims regarding the grade crossing warnings. Claims regarding the visibility of the freight car were abandoned. Summary judgment was accordingly entered for the Railway. Mrs. Pearson appeals, arguing that the holding of the initial opinion of this Court was in error. She further alleges that disputes of material fact continue to exist. We find no error and affirm.
¶ 3. Since our rulings on the initial appeal are central to the review that we perform now, we incorporate that opinion here.

Opinion of Court of Appeals, October 17, 1995
¶ 4. Bernice Pearson brought suit against the Columbus & Greenville Railway Company seeking compensation for injuries suffered when she late at night drove her automobile into the side of a standing gondola car parked across a public street. The circuit court of Sunflower County granted summary judgment to the Railway. The issue below and here is whether recent United States Supreme Court authority regarding federal preemption applies to the facts of this case and bars Pearson's claims. The factual predicates for preemption regarding the warning signs were not sufficiently developed. However, even if those facts are proved, there is no preemption affecting the conspicuousness of the freight car at the crossing. We reverse and remand.

STATEMENT OF FACTS
¶ 5. The Columbus & Greenville Railway operates trains through the Mississippi Delta town of Moorhead. That town has a poetic association with this railroad. The tracks of the Columbus & Greenville's predecessor, the Southern Railway, and the tracks of the Yazoo Delta Railroad, nicknamed the "Yellow Dog," intersected at Moorhead. The town became known, including through a 1901 blues song composed by W.C. Handy, as the place "where the Southern crosses the Dog." Marie M. Hemphill, Fevers, Floods, and Faith: A History of Sunflower County, 1844-1976, privately pub., Indianola (1980), at 261. Its more important and prosaic association for purposes of this suit is that an accident occurred there.
¶ 6. After dark on February 19, 1991, Bernice Pearson drove her automobile into the side of a standing gondola car, which is a freight car with sides but no roof, typically used for hauling bulk products that can be loaded from the top. The only warning of the approaching railroad crossing *393 was a crossbuck, which is the typical unlighted sign consisting of a white "X" that says "RAILROAD CROSSING," attached to a pole, and placed within a few feet of the tracks. The freight car had been stationary for a number of minutes as part of a switching maneuver.
¶ 7. In January, 1992 Pearson brought suit against the Railway. Generally she claimed the crossing was unreasonably dangerous, but specifically her allegations of negligence were these:
1) The circumstances at this crossing made a freight car unreasonably difficult to see; reasonable and adequate warnings of the freight car's presence were needed such as through a flagman, portable lighting, flares or barricades.
2) leaving the freight car across the roadway was negligence.
¶ 8. On October 5, 1993, summary judgment was granted to the Railway based on federal preemption. In an earlier order, the court found that Pearson "does not complain of the adequacy of the permanent warning devices at the crossing. Rather, Plaintiff contends that under the conditions and circumstances existing at the time of the collision, Defendant should have taken additional steps to warn her of the blockage of the crossing."
¶ 9. Besides Pearson and the Railway, joining in this action as amici curiae are the Association of American Railroads and the American Shortline Railroad Association. These amici described themselves as associations consisting of "virtually all Class I [the largest] freight railroads and Amtrak, and most regional and short line railroads in America." Also joining the action as amicus is the United States government, advising us of its interpretation of federal preemption.[1]

DISCUSSION
¶ 10. It is an almost trite truism, but one that controls the outcome in this case:
The Constitution, and the Laws of the United States which shall be made in Pursuance thereof; ... shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby....
U.S. Const., Article VI, Cl. 2. By its terms, the laws of the United States which are supreme must be made "in Pursuance" of the Constitution. The United States Constitution delegates powers to the federal government. Without the delegation those powers would not be possessed. In explicit recognition of that fact, Amendment X was added to the Constitution as part of the Bill of Rights: "The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." U.S. Const. Am. X.
¶ 11. Much of the early judicial and even political history of this republic concerns the defining of the powers that were delegated and those which the states and people reserved. Much federal legislation that affects the states has been considered authorized under the nearly plenary delegation of power to Congress to regulate interstate commerce. Congress' justification for its actions is usually approved even when that justification stretches common sense definitions of interstate commerce. Occasionally, though, this stretch has snapped the indulgent attitude of the United States Supreme Court. United States v. Lopez, 514 U.S. 549, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995).
¶ 12. The issue before us concerns safety at railroad crossings. A national railroad system, composed of its independent companies, is quintessentially part of interstate commerce. Thus, the question is not *394 whether the federal government has authority to preempt state laws in the area of safety at railroad crossings, but whether the federal government has preempted, and if so, to what extent the facts of this case are within the scope of the preemption.
¶ 13. The focus of our analysis is the breadth of a 1993 United States Supreme Court decision. CSX Transportation, Inc. v. Easterwood, 507 U.S. 658, 113 S.Ct. 1732, 123 L.Ed.2d 387 (1993). That case, as does this one here, involved a collision between a train and a vehicle at a railroad crossing. Thomas Easterwood was killed when the truck he was driving was struck by a moving train owned by CSX Transportation. His widow brought suit, complaining that CSX was negligent for failing to maintain adequate warning devices at the crossing and for operating the train at an excessive speed. The Court described the relevant federal legislation as being intended "to promote safety in all areas of railroad operations and to reduce railroad-related accidents...." Easterwood, 507 U.S. 658, 113 S.Ct. at 1736 (quoting 45 U.S.C. § 421). Two statutes operate in this area, the Federal Railroad Safety Act of 1970,[2] codified at 45 U.S.C. §§ 421-447; and the Highway Safety Act of 1973, codified at 23 U.S.C. §§ 101-133.
¶ 14. These Acts establish a comprehensive set of duties on the states, the Federal Highway Administration and the Federal Railroad Administration, to improve railroad crossing safety. Easterwood, 507 U.S. 658, 113 S.Ct. at 1736-37. After rejecting several possible federal preemption arguments made by the railroad, the Easterwood Court found that two regulations adopted under the authority of the Highway Safety Act did result in federal preemption, but only "when they are applicable." Id., 507 U.S. 658, 113 S.Ct. at 1740-41. A brief description of the statutory program that results in preemption follows.
¶ 15. The Federal Railroad Safety Act compels preemption in this way:
The Congress declares that laws, rules, regulations, orders and standards relating to railroad safety shall be nationally uniform to the extent practicable. A State may adopt or continue in force any law, rule, regulation, order, or standard relating to railroad safety until such time as the Secretary [of Transportation] has adopted a rule, regulation, order, or standard covering the subject matter of each State requirement. A State may adopt or continue in force an additional or more stringent law ... when necessary to eliminate or reduce an essentially local safety hazard, and when not incompatible with any Federal law, rule, regulation, order, or standard, and when not creating an undue burden on interstate commerce.
45 U.S.C. § 434.
¶ 16. The Highway Safety Act of 1973:
makes federal funds available to the States to improve grade crossings, in return for which the States must "conduct and systematically maintain a survey of all highways to identify those railroad crossings which may require... protective devices, and establish and implement a schedule of projects for this purpose."
Easterwood, 507 U.S. 658, 113 S.Ct. at 1737 (quoting 23 U.S.C. § 130(d)). This makes evident that the states administer the program, but pursuant to federal regulations.
¶ 17. The Supreme Court held that under 23 C.F.R. § 646.214(b)(3) and (4),
a project for the improvement of a grade crossing must either include an automatic gate or receive [Federal Highway Administration] approval if federal funds *395 "participate in the installation of the [warning] device." [footnote omitted.] Thus, ... §§ 646.214(b)(3) and (4) displace state and private decision making authority by establishing a federal-law requirement that certain protective devices be installed or federal approval obtained.... Likewise, § 646.214(b)(4), which covers federally funded installations at crossings that do not feature multiple tracks, heavy traffic, or the like, explicitly notes that railroad participation in the initial determination of "the type of warning device to be installed" at particular crossings is subject to the [Transportation] Secretary's approval.... In short, for projects in which federal funds participate in the installation of warning devices, the Secretary has determined the devices to be installed and the means by which railroads are to participate in their selection. The Secretary's regulations therefore cover the subject matter of state law which, like the tort law on which respondent relies, seeks to impose an independent duty on a railroad to identify and/or repair dangerous crossings.

Id., 507 U.S. 658, 113 S.Ct. at 1741(emphasis supplied). Therefore, if federal funds are used, automatic gates must be installed or federal approval obtained for a different type of warning device.[3] The Court was explicit that state regulation, including regulation through private tort suits, would then be barred.
¶ 18. After describing the applicable law, the Supreme Court proceeded to determine whether the "preconditions" to apply this preemption were present under the facts. The Court found that the crossing involved in the Easterwood accident had been the subject of a Georgia Department of Transportation study. The decision was made to install an automatic gate with flashing lights. However, because of problems with the local government, the gate was never installed. The Court in effect found that this crossing was one step removed from the applicability of preemption. What was needed was more than just a plan; there must have been implementation of that plan. Id., 507 U.S. 658, 113 S.Ct. at 1741-42. Several cases cited by Pearson in which preemption was not found, reached that conclusion for similar reasons, i.e., the federally funded project had not been commenced or completed. E.g., St. Louis Southwestern Ry. Co. v. Malone Freight Lines, 39 F.3d 864, 866-67 (8th Cir.1994), cert. denied, 514 U.S. 1110, 115 S.Ct. 1963, 131 L.Ed.2d 854; Thiele v. Norfolk & Western Ry. Co., 873 F.Supp. 1240, 1248 (N.D.Ind.1994).
¶ 19. We must now address the application of these principles to the present case. Pearson dismisses the entire line of authority as irrelevant since she does not complain about the adequacy of the fixed warning signs. She argues that the Railway's duty to warn of this particular stationary freight car is a separable duty from the duty to warn of the crossing. The Federal Railroad Safety Act mandates that there is preemption once federal railroad safety "regulations cover the subject matter of state law which ... seeks to impose an independent duty on a railroad...." Easterwood, 507 U.S. 658, 113 S.Ct. at 1741. We must decide if preemption applies to the adequacy of the fixed warning signs at the Moorhead crossing, and if so, whether Pearson's claims of railroad negligence raise separate duties or are included within the same safety "subject matter."
¶ 20. The circuit court relied on two affidavits submitted by the Railway. One of the affidavits stated: "The funds expended in making the requirements for crossbuck signs at said intersection, establishing the type and design thereof, and in the purchase, placing and erection thereof," were ninety percent from the federal *396 government and ten percent from the Railway. Neither affidavit refers to when the work was conducted, nor in any way obvious to the court indicates that the project for which money was expended was pursuant to the Highway Safety Act's upgrade of crossings. Relying on language from Easterwood, the circuit court concluded that since "federal funds constituted ninety percent of the expenditure on the installation of the warning device at the crossing where Plaintiff collided with Defendant's train," the claim was preempted.
¶ 21. No one before this court is arguing that the mere expenditure of federal funds, from whatever source, for whatever reason, triggers preemption. Instead, the Railway argues that the presence of federal funds is proof that the Secretary of Transportation has approved a crossbuck warning device as the sole necessary warning at this intersection. Both parties focus on the meaning of the phrase in Easterwood, "for projects in which federal funds participate in the installation of warning devices, the Secretary has determined the devices to be installed and the means by which railroads are to participate in their selection." Easterwood, 507 U.S. 658, 113 S.Ct. at 1741 (emphasis added).
¶ 22. Pearson argues that this language must be read in the context of the relevant regulations. The determination of proper warning devices at crossings is supposed to occur by surveys conducted with diagnostic teams which recommend the use or nonuse of crossing gates or other "active" warning devices. 23 C.F.R. § 646.214(b)(3)(I)(F) and (3)(ii). Pearson points out that there is no evidence in the record that the Railway participated in any diagnostic team, nor is there any proof beyond mere use of federal funds that the Secretary approved a crossbuck (a "passive" system) at this intersection as the requisite warning device. In Easterwood, the proof involved an affidavit from the Georgia Department of Transportation which indicated that this state agency had decided to install a crossing gate at the relevant crossing. Easterwood, 507 U.S. 658, 113 S.Ct. at 1741. Thus the Supreme Court had proof that there was a project which the state agency had approved, using federal funds. That project was not completed, and thus preemption did not occur. Whatever the Supreme Court meant by its language focusing on whether federal funds were involved, the evidence in the case was clear that a project under the Highway Safety Act had led to the expenditure of funds.
¶ 23. We find particularly instructive a recent Fifth Circuit case on very similar facts. Hester v. CSX Transp., Inc., 61 F.3d 382 (5th Cir.1995). The Hester court said the relevant issue on preemption of a claim regarding inadequate warnings of a crossing was whether federal funds participated in the installation of a warning device. If so, then common law tort claims based on inadequate warnings would be preempted. Hester, 61 F.3d at 384-86. The Hester accident occurred at a crossing in Jackson County, Mississippi. An affidavit was introduced from the Mississippi Department of Transportation that showed "from 1981 to 1983 federal funds were approved and expended in the upgrade and installation of reflectorized crossbucks, advance warning signs and advance pavement warning markings" at this crossing. Id. at 386. Because of preemption, no argument could be made by the plaintiffs that such warnings were inadequate. Id.
¶ 24. As Pearson does here, the plaintiff argued it was necessary that a diagnostic team have made recommendations with respect to the crossing, and no proof of that was presented. The district court granted summary judgment only after receiving evidence that CSX at least participated in a diagnostic team. The Fifth Circuit considered participation in such a team to be a subordinate question, and that participation "is by itself insufficient to establish that federal funds participated in the improvement of the crossing...." Id. What it required is "an actual, authorized expenditure of federal funds in the installation *397 or placement of safety devices at the particular crossing to trigger preemption." Id. According to statute, "[n]o funds shall be approved for expenditure ... unless proper safety protective devices complying with safety standards determined by the Secretary at that time as being adequate shall be installed or be in operation at any highway and railroad grade crossing...." 23 U.S.C. § 109(c). The Hester court said that the participation of federal funds "legally presupposes that the Secretary approved and authorized that expenditure, which in turn legally presupposes that the Secretary determined that the safety devices installed were adequate to their task." Hester, 61 F.3d at 387. Thus the court is relying on a presumption, that if funds were expended, it was only after the procedures set out in these regulations were followed.
¶ 25. The Hester court referred to a Seventh Circuit case that reached an "arguably... contrary conclusion" to its own on the adequacy of federal funding evidence, but the court did "not know precisely what evidence was before the Shotts court nor the full facts of that case." Hester, 61 F.3d at 387 n. 9 (citing Shots v. CSX Transp., Inc., 38 F.3d 304 (7th Cir. 1994)). On the other hand, the Hester court cited an Eighth Circuit case to conclude that "actual, authorized expenditure of federal funds in the installation of a safety device is sufficient to trigger preemption." Hester, 61 F.3d at 387 (citing St. Louis Southwestern Ry. Co., 39 F.3d at 866-67).
¶ 26. Pearson presented no evidence in the court below to counter the Railway's affidavits that the federal funds were used in the installation of these crossbucks. It is true, the Railway produced no evidence that this crossing was ever considered by a diagnostic team, nor was evidence presented of any specific federal determination that a crossbuck was adequate at this crossing. We are not required to follow Fifth Circuit interpretation of federal law, but their determination as to the meaning of this statute is controlling in all federal courts in Mississippi. It is unnecessarily disruptive to apply a different interpretation of a federal statute in state court than is applied in our state's federal courts, at least when the interpretation is reasonable. We find the holding of Hester in the following language:
The fact that federal funds participated in the installation of the warning devices legally presupposes that the Secretary approved and authorized that expenditure, which in turn legally presupposes that the Secretary determined that the safety devices installed were adequate to their task. There is no evidence that this did not in fact happen. Nor is there any evidence demonstrating that passive warning devices alone were deemed inadequate (or were not found adequate) [by a diagnostic team] to promote safety at Hatley Circle.
Hester, 61 F.3d at 387 (footnote omitted). We specifically conclude that the actions of a diagnostic team are not a separate item of proof. The use of federal funds "presupposes that the Secretary approved and authorized that expenditure...."
¶ 27. However, this language must be read against the background of the Hester facts. We cannot begin to fathom the myriad ways that federal funds might through the decades have been used at the Moorhead crossing. Perhaps the only program under which federal funds could have been granted is the Highway Safety Act for upgrading crossings. Perhaps not. What we must be assured is that the funds were expended for the purposes and under the program that led the Easterwood Court to find preemption.[4] The Railway would have us adopt this false syllogism: a project approved under the applicable program is given federal funds; the crossbuck *398 at this crossing was constructed using federal funds; therefore, there was approval under the applicable program for a project on this crossing. The problem with the conclusion is that it is valid only if the first premise were that only projects approved under the Highway Safety Act for crossing upgrades receive federal funds. We will not make that assumption. Like the proof actually submitted in Hester and Easterwood, there must be proof here that these federal funds were part of a relevant project for upgrading and improving railroad crossings under the Highway Safety Act. If so, then issues regarding the adequacy of the crossing warningsactive or passive, mechanical or human[5]are preempted.
¶ 28. If there is preemption of the signalization claim, are all of Pearson's claims of railroad negligence part of that "subject matter?" In Hester, the district court found preemption barred some of the claims, but not those based on overgrown right-of-way vegetation that obstructed a motorist's view, the railroad crew not keeping a proper lookout, the train's whistle not blowing, and braking being too slow. Hester, 61 F.3d at 384 n. 1. Since the jury found for the railroad on those remaining issues, the Fifth Circuit did not have to address whether all those claims actually were outside of preemption. In our case, the Department of Justice on behalf of the United States as amicus curiae, in effect argues that the subject matter does not include the safety requirements for warning motorists of a stationary railroad car. The Department asserts "no federal regulation states a railroad's duty with respect to hazards posed by the presence of non-moving freight cars obstructing a crossing." The facts of the cases cited to us concern collisions with moving trains. None of them refer to stationary trains as a potentially different issue. We therefore turn to the language of the statutes and regulations. The regulations define what is an adequate warning device at a grade crossing. There is no indication in this regulation that it is limited to warning of moving trains. Instead, the regulation concerns "railroad-highway grade crossings." 23 C.F.R. § 646.214(b)(2). The regulation also requires that "all traffic control devices proposed shall comply with the latest edition of the manual on uniform traffic control devices for streets and highways...." Id. § 646.214(b)(1). The manual, as quoted in Easterwood, states "the highway agency and the railroad company are entitled to jointly occupy the right of way in the conduct of their assigned duties. This requires joint responsibility in the traffic control function between the public agency and the railroad." U.S. Dept. of Transportation, Federal Highway Administration, Manual on Uniform Traffic Control Devices for Streets and Highways (1988), at 8A-1, cited in Easterwood, 507 U.S. 658, 113 S.Ct. at 1740.
¶ 29. Any distinction between moving and non-moving trains is beyond the language of these regulations and the manual. The issue that has been resolved by the regulations is the adequacy of warnings of an approaching railroad crossing. That resolution controls whether it is daylight or dark, whether a train is present or only imminent. It is the possibility that a train is coming down the track or has already arrived that propels the duty to warn in the first place. A proper warning of a crossing alerts a motorist to look left, right, and straight ahead for trains. To raise the specifics of the accident in an effort to prove the federally-mandated warnings were inadequate in this instance is to second-guess the federal decision. That is precisely what preemption prevents.
¶ 30. In other words, it does not matter whether a train hits the side of an automobile (the automobile was in the *399 crossing first), or an automobile collides with the side of a train (the train arrived first). Further, if a claim is preempted when an automobile collides with the middle car of a moving 100 car train, moving perhaps as slowly as it is possible for a train to move (and we take judicial notice that can be very slowly), it would be anomalous and illogical not to preempt a claim when the freight car is stationary. Negligence arising from a railroad car being left stationary at a crossing is within the "subject matter" of the preemptive regulations on warning devices.
¶ 31. Pearson makes an argument independent of the adequacy of the warnings of a crossing. The claim could be described as follows: if an alert motorist, properly warned of an approaching railroad crossing, cannot with the exercise of reasonable care see a train at night that is already in the crossing, the railroad has breached a duty for which it is liable in damages if the motorist is injured as a proximate result of that breach. The factual basis of the claim is the alleged absence of any lighting on the freight car, its dark appearance, and the absence of any railroad employees with flares or lights. It has not been argued that the car was so lacking in reflectors or other illumination as to be part of a ghost train, but that is the concept.
¶ 32. For the same reason that railroads' liability based on warnings of crossings can be preempted by federal regulation, we have no doubt that liability premised on train visibility can be preempted. We must decide whether such claims have been preempted. As the Federal Railroad Safety Act mandates, states may regulate railroad safety when there is as yet no federal standard, or when the state is seeking to eliminate an essentially local hazard.[6] 45 U.S.C. § 434; see also Missouri Pac. R. Co. v. Railroad Comm'n of Texas, 948 F.2d 179 (5th Cir.1991), cert. denied, 507 U.S. 1050, 113 S.Ct. 1943, 123 L.Ed.2d 649 (1993). The Railway refers to the Locomotive Inspection Act, 49 U.S.C. § 20701, which solely concerns the lighting and safety measures on locomotives. Except to the extent Pearson might claim the railroad should have had a different kind of light on the locomotive, we find this statute has no preemptive effect on this case. In addition, the Railway cites the Safety Appliance Act, 49 U.S.C. § 20301. However, that Act does not concern the warnings to third parties of the presence of a car, but instead deals with the safety measures that make the freight car safe for railroad employees, such as couplers, hand brakes, running boards, and so forth. It too is irrelevant.
¶ 33. If a functioning "active warning device" had been at this crossing, one "activated by the approach or presence of a train," 23 C.F.R. § 646.204(i), then the visibility of the train is not factually, but also not legally an issue for a negligence claim. Besides automatic gates and flashing lights, this category of warning includes flagmen. Id. "Passive warning devices," on the other hand, "indicate the presence of a crossing," not the presence of a train. 23 C.F.R. § 646.204(j). A passive warning device requires a motorist to be alert to the possibility of a train. Regardless of the remedyreflectors on the car, a flare on the street, or other actiona claim that a railroad was negligent in not making a nearly indiscernible freight car more conspicuous is a different "subject matter" than the passive crossing warnings. That is because a railroad's appropriate crossbuck and a motorist's appropriate response still lead to collisions with undetectable obstructions.
¶ 34. No statute or regulation has been cited to us that establishes requirements for making freight cars visible. Thus *400 there is no explicit preemption. However, the Supreme Court recognizes both explicit and implicit preemption. Implied preemption has been described this way: "`where failure of ... federal officials affirmatively to exercise their full authority takes on the character of a ruling that no such [state] regulation is appropriate or approved pursuant to the policy of the statute,' States are not permitted to use their police power to enact such a regulation." Ray v. Atlantic Richfield Co., 435 U.S. 151, 158, 98 S.Ct. 988, 55 L.Ed.2d 179 (1978), citing Bethlehem Steel Co. v. N.Y. State Labor Relations Bd., 330 U.S. 767, 774, 67 S.Ct. 1026, 91 L.Ed. 1234 (1947). The most analogous implied preemption case concerns whether the absence of a statute or a FRA regulation regarding cabooses meant a state was free to hold that cabooses had to be included on trains for safety reasons. Missouri Pac. RR v. Railroad Comm'n of Texas, 850 F.2d 264 (5th Cir.1988), cert. denied, 488 U.S. 1009, 109 S.Ct. 794, 102 L.Ed.2d 785 (1989). After examining a FRA report published in the Federal Register that concluded a railroad's use of cabooses as opposed to end-of-train telemetry devices was not a safety issue, the court held that state regulation was impliedly preempted. Missouri Pac., 850 F.2d at 267-68; see also, Norfolk & Western Ry. Co. v. Public Utilities Comm'n of Ohio, 926 F.2d 567 (6th Cir. 1991) (refusal to adopt regulation for walkways on bridges created negative or implied preemption).
¶ 35. In the supplemental briefing we requested, we have been directed to no analogous decision here. We are referred to one precedent, predating Easterwood and which does not mention the then-recent Federal Railroad Safety Act, that holds no negligence can be proven by a railroad's failure to equip their freight cars with reflectors or lights. Beenken v. Chicago & Northwestern R.R. Co., 367 F.Supp. 1337, 1338 (N.D.Ia.1973). One of the two cases Beenken cited concerns whether a crossing, not a freight car, should have had lights, bell, or gong. Gant v. Chicago & Northwestern Ry. Co., 306 F.Supp. 325 (S.D.Ia.1969). The other case observed it could find no precedent establishing a common-law duty to have lights or reflectors on freight cars; the issue was nondispositive anyway, as the motorist had already been found the clearly negligent party. Music v. N.Y. Cent. R.Co., 2 Mich.App. 467, 140 N.W.2d 567, 569 (Mich.App.1966). That case described Beenken's final authority, an ICC study, as ending "without [the ICC's] making recommendation as to proposed changes...." Id. The ICC report says "it is doubtful whether the placing of reflectorized material on the sides of cars would serve any useful purpose or justify the expense of installing such material. Therefore, we are disinclined to recommend its installation." Report of the Interstate Commerce Commission, Docket No. 33440, 322 ICC 1, 70 (1970).
¶ 36. More recently, this comment appears from the FRA:
FRA has also explored the possibility of equipping freight cars with reflectorized markings and installing alerting lights on locomotives as ways of improving the conspicuity of trains. In neither instance was FRA able to conclude that safety would be enhanced by requiring such devices.

53 Fed.Reg. 47554, 47555 (1988)(emphasis supplied). This may be a reference to a cursory statement in 1984 by the Department of Transportation that a study "provided considerable evidence that reflectorization would be costly to maintain and that it would have little or no effect on preventing rail/highway grade crossing accidents." 49 Fed.Reg. 39624, 39626 (1984). Based on these three statements, the only ones we have found, the FRA and before them the ICC only made observations on reflectors, not conclusions. Congress entered the fray in 1994 by requiring the FRA to examine railroad car visibility and to adopt regulations. 49 U.S.C. § 20148; see 1994 U.S.Code Cong. & Admin. News, at 3670 *401 (suggesting this Act is for High Speed Rail situations).
¶ 37. There is evidence that no decision was made to set uniform standards for reflectors. For preemption, what is needed is proof in some form that the agency concluded "that no such [state] regulation is appropriate...." Ray, 435 U.S. at 179, 98 S.Ct. 988. Being "disinclined" as the ICC was in 1970, or finding "evidence" of slight safety benefits as did the FRA in 1984, does not amount to a decision that occupies the subject matter for preemption purposes. It is when the agency molds inclinations and evidence into a determination that safety would not be enhanced that states become barred from regulating the subject. Similarly, the Fifth Circuit found no preemption from the Federal Railroad Administration's non-decision regarding the walkways beside tracks in railroad yards. Missouri Pac. R.R. Co. v. Railroad Comm'n of Texas, 833 F.2d 570, 576 (5th Cir.1987). The agency had not made a decision to do nothing. It had simply not made a decision.
¶ 38. We find that the FRAdespite hinting at a position in 1984 and 1988has in fact made no decision. The Federal Railroad Safety Act permits local rules and standards to continue "until such time as the Secretary has adopted" a national rule "covering the subject matter...." 45 U.S.C. § 434. Since Congress in 1994 ordered the FRA to look at the issue, the subject matter may ultimately have congressionally mandated national standards. For now there are no standards, and no FRA decision that there should be no standards.
¶ 39. We are not holding there is a duty on a railroad, independent of its duty to warn of crossings, to make certain its cars are conspicuous, or if such a duty exists, whether it has been breached here. We are only saying on this appeal from a summary judgment that the claim is not preempted.
¶ 40. In sum, negligence suits involving railroad-automobile accidents are not as a category of case preempted. If the claimed negligence is based on inadequate warnings of crossings, or excessive speed (Easterwood, 507 U.S. 658, 113 S.Ct. at 1743), or inadequate locomotive lighting, those claims are preempted in applicable circumstances. The conspicuousness of freight cars in a situation such as is alleged here, is not preempted.
¶ 41. On remand, the Railway should have an opportunity to present evidence to prove the expenditure of federal funds was due to the kind of project contemplated in Easterwood. The evidence presented in appendices and footnotes to the briefs submitted to this Court might well suffice, if not cast in a different light by Pearson's evidentiary response. Should this evidence prove sufficient, then claims based on the crossing being unreasonably dangerous or that the freight car should not have been left stationary across the street are preempted. Regardless, Pearson may continue her claim beyond the preemption barrier as to the visibility of the freight car.

DISCUSSION REGARDING SECOND APPEAL

1. Law of the Case
¶ 42. Most of what Mrs. Pearson argues in this appeal was discussed by the Court in our opinion of October 17, 1995. Mrs. Pearson reargues the position she took in the original appeal against preemption and presents many of the same precedents. The Railway responds in much the same fashion as before. We have been pointed by neither party to an intervening decision of a superior court in which the legal analysis set out in our 1995 opinion has been undermined. Thus the "law of the case" doctrine is invoked.
¶ 43. This doctrine was discussed in the second appeal of a case to the supreme court, in which the appellant asked that the decision in the first appeal be rejected. *402 Florida Gas Exploration Co. v. Searcy, 385 So.2d 1293, 1295 (Miss.1980). The court refused:
The doctrine of the law of the case is similar to that of former adjudication, relates entirely to questions of law, and is confined in its operation to subsequent proceedings in the case. Whatever is once established as the controlling legal rule of decision, between the same parties in the same case, continues to be the law of the case, so long as there is a similarity of facts. This principle expresses the practice of courts generally to refuse to reopen what has previously been decided. It is founded on public policy and the interests of orderly and consistent judicial procedure.
Id., quoting Mississippi College v. May, 241 Miss. 359, 366, 128 So.2d 557 (1961). The court noted that there was an exception to the doctrine: "rare cases where the decision is manifestly and palpably erroneous and to follow it would result in grave injustice being done." Florida Gas, 385 So.2d at 1295, quoting Brewer v. Browning, 115 Miss. 358, 366, 76 So. 267, 270 (1917).
¶ 44. The original decision on appeal was three years ago. Mrs. Pearson neither sought rehearing in this court nor certiorari from the supreme court. Since that time further proceedings have been held in the trial court structured around our previous opinion. Based on what she argues should have been our conclusions three years ago, she requests that we reverse and remand againnot because the trial court failed to understand or comply with our remand order, but precisely because the court did understand and comply.
¶ 45. The reasons for the law of the case doctrine could not be more clearly presented. We will address what was determined before and how it affects what has returned on this second appeal. Only if an earlier conclusion is found to be manifestly and palpably erroneous will we deviate from it.

2. Federal preemption
¶ 46. Though an arcane doctrine in some respects, federal preemption has become dominant in litigation regarding railroad crossing accidents. An interstate railroad system and specifically the safety in that system are matters of both federal and state concern. However, by federal law railroads and the United States Department of Transportation have been engaged in addressing the safety needs at crossings and determining the appropriate warning system, from crossing gates and lights, down through a continuum of lesser devices. By statute, a policy has been declared that "Laws, regulations, and orders related to railroad safety shall be nationally uniform to the extent practicable." 49 U.S.C. § 20106. Federal preemption exists here as a doctrine because uniformity would be lost if, after a review has been made by federal highway safety officials and the railroads, a State nonetheless imposes different requirements. Those different requirements are as violative of the preemption doctrine if they arise under case by case tort litigation as if they arise through other means.
¶ 47. Mrs. Pearson begins her argument at the most fundamental level already decided by this Court in the first appeal, whether preemption even applies. Cited is a recent United States Supreme Court case on the issue, Medtronic v. Lohr, 518 U.S. 470, 116 S.Ct. 2240, 135 L.Ed.2d 700 (1996). The question of whether preemption exists as to railroad crossing warnings quite simply is controlled by the explicit statements in CSX Transportation, Inc. v. Easterwood, 507 U.S. 658, 113 S.Ct. 1732, 123 L.Ed.2d 387 (1993), as we held in the first appeal. Nothing in Medtronic begins to question the continuing validity of Easterwood. Easterwood was interpreted in a manner consistent with our view in Hester v. CSX Transp., Inc., 61 F.3d 382 (5th Cir.1995). No subsequent Fifth Circuit opinion has dealt with Easterwood, so Hester is the latest statement of the law of the *403 federal circuit in which Mississippi is located.
¶ 48. In order to decide if the factual predicates for preemption exist as to a specific crossing, the Hester court said the relevant issue was whether federal funds were used in the installation of the warning device at the relevant crossing, provided those funds were expended under the program for assessing the warning requirements for different crossings. Hester, 61 F.3d at 384-86. The Hester accident occurred at a crossing in Jackson County, Mississippi. A Mississippi Department of Transportation affidavit asserted that "from 1981 to 1983 federal funds were approved and expended in the upgrade and installation of reflectorized crossbucks, advance warning signs and advance pavement warning markings" at this crossing. Id. at 386. That was the evidence that the court found prevented an argument by the plaintiffs that the warnings were inadequate. Id.
¶ 49. As we will discuss in the next section, evidence was submitted on remand that federal funds were used at the crossing relevant for the present suit, and those funds were paid as a result of the federal program for upgrade of this Railway's system. Mrs. Pearson alleges that the use of federal funds is not enough. A regulation makes reference to a "diagnostic team" that helps make determinations regarding warning devices at crossings. Despite that both Easterwood and Hester refer to the expenditure of federal funds as the key for assessing whether preemption applies, Mrs. Pearson argues that proof of the work of a diagnostic team must also be introduced.
¶ 50. First, that question was explicitly analyzed and answered in the first appeal of this case. As stated then, "[w]e specifically conclude that the actions of a diagnostic team are not a separate item of proof. The use of federal funds `presupposes that the Secretary approved and authorized that expenditure....'" In reaching that conclusion, we relied on the fact that according to statute, "[n]o funds shall be approved for expenditure ... unless proper safety protective devices complying with safety standards determined by the Secretary at that time as being adequate shall be installed or be in operation at any highway and railroad grade crossing...." 23 U.S.C. § 109(c).
¶ 51. In other words, preemption has not been limited to situations in which the court reviews the work of a diagnostic team, the railroad, and the Federal Highway Administration, all of which are involved in the decision for the kind of crossing warning device needed, and compares each participant's work against the requirements of statute and regulation. Instead of going behind the decision, the Fifth Circuit held that use of federal funds "legally presupposes that the Secretary approved and authorized that expenditure, which in turn legally presupposes that the Secretary determined that the safety devices installed were adequate to their task." Hester, 61 F.3d at 387. That is all that was necessary to show the predicates for preemption.
¶ 52. Mrs. Pearson argues that our opinion found the presumption that the installation of a crossbuck was properly approved to be a rebuttable one. If so, it has not been rebutted. However, the first appeal did not in fact so state. The absence of greater proof of actions by a diagnostic team could have arisen from the fact that this Court unanimously removed that question from being an item of proof on remand. Even so, the Railway submitted an interrogatory answer that this particular crossing was in fact included when a "diagnostic team ... studied all grade crossings, classified their relative safety based on traffic volumes" and other factors, and then determined the proper signals. Admittedly, the evidence of a diagnostic team is not detailed. What is evident, though, is that nothing rebutted a presumption, whether it even is rebuttable, that the admitted use of federal funds on this crossing was approved by the Secretary *404 through action of the Federal Highway Administration.
¶ 53. In saying that the use of the funds is insufficient, Mrs. Pearson cites the key contrary decision, which is from the Seventh Circuit, Shots v. CSX Transp., Inc., 38 F.3d 304 (7th Cir.1994). The Hester court discussed Shots and acknowledged that it appeared inconsistent, but the court did "not know precisely what evidence was before [the Seventh Circuit] nor the full facts of that case." Hester, 61 F.3d at 387 n. 9. The Shots court held that it was unrealistic to conclude that the Secretary of Transportation had determined what devices were to be installed at any crossing "merely because he authorized federal funds" to be used on them. Shots, 38 F.3d at 309. On the other hand, the Hester court cited an Eighth Circuit case to conclude that "actual, authorized expenditure of federal funds in the installation of a safety device is sufficient to trigger preemption." Hester, 61 F.3d at 386 n. 6 (citing St. Louis Southwestern Ry. Co. v. Malone Freight Lines, Inc., 39 F.3d 864, 866-67 (8th Cir.1994)).
¶ 54. Interestingly, Hester focused on the effect of having evidence of a railroad's participation in a diagnostic team, but having no other evidence. Such participation "is by itself insufficient to establish that federal funds participated in the improvement of the crossing; there must be actual, authorized expenditure of federal funds in the installation or placement of safety devices at the particular crossing to trigger preemption." Hester, 61 F.3d at 386 n. 6 (emphasis added). Thus a diagnostic team is never the issue; it is whether federal funds were used for the crossing. Here there apparently was a diagnostic team that on the State's behalf studied crossings. But that is irrelevant and indeed insufficient. It is the use of funds is what "presupposes" the Secretary of Transportation was satisfied with the plan.
¶ 55. There is no dispute that at this crossing placement of a cross-buck was authorized and that federal funds were used to install it. Mrs. Pearson relies on interrogatory answers that she interprets to mean that the Secretary of Transportation never specifically authorized, after a review of the requirements at that specific location, the use of a cross-buck. We disagree. The information submitted on summary judgment revealed that a plan was presented whereby a cross-buck would be the device at the relevant crossing. That crossing was one of a long list, but nonetheless it was on the submission. That plan with this crossing listed was approved by the Federal Highway Administration, which is the designee of the Secretary of Transportation.
¶ 56. Such evidence is exactly what was before the court in Hester. Mrs. Pearson's argument is exactly what was dismissed in Hester.
The Hesters argue that there is no record evidence demonstrating that the Secretary made a determination that these passive warning devices [cross-bucks] were adequate to protect motorists at Hatley Circle. The statute and regulations preclude this argument. The regulations direct the Secretary to authorize the expenditure of federal funds only on projects that satisfy, inter alia, the requirements of federal law, specifically 23 U.S.C. § 109. See 23 C.F.R. § 630.114(b). Under this section, "no funds shall be approved for expenditure ... unless proper safety devices complying with safety standards determined by the Secretary at the time as being adequate shall be installed...."
Hester, 61 F.3d at 387.
¶ 57. Evidence of federal funds is necessary and that evidence is sufficient. The Seventh Circuit Shots opinion relied upon by Mrs. Pearson has been the exception at the federal circuit level to accepting that kind of evidence. Otherwise proof of federal expenditures has been the determinant. That is what we held in the original appeal, consistent with the view in Hester. *405 See, e.g., Armijo v. Atchison, Topeka & Santa Fe Ry., 87 F.3d 1188, 1189-90 (10th Cir.1996); Elrod v. Burlington Northern R.R., 68 F.3d 241, 244 (8th Cir.1995). The Shots opinion admits it aberrant approach, but says that it does not think that the "literal reading [of Easterwood] is the correct one...." Shots, 38 F.3d 304, 307. The literal Easterwood language is this:
In short, for projects in which federal funds participate in the installation of warning devices, the Secretary has determined the devices to be installed and the means by which railroads are to participate in their selection. The Secretary's regulations therefore cover the subject matter of state law ... which seeks to impose an independent duty on a railroad to identify and/or repair dangerous crossings.
Easterwood, 507 U.S. at 671, 113 S.Ct. 1732.
¶ 58. We and most courts have taken the United States Supreme Court to mean what it said in Easterwood. We continue in that view.
¶ 59. Finally, Mrs. Pearson takes us and several federal courts to task for allegedly not recognizing that there is a distinction between preemption under two different parts of the regulations. One subsection of the relevant regulation requires "active warning devices" if there are multiple tracks, high speed trains, or heavy highway traffic, or if other reasons cause a diagnostic team to recommend such devices. 23 C.F.R. § 646.214(b)(3). The other subsection states that when the (b)(3) does not apply, then the device that must be at the crossing "is subject to the approval" of the Federal Highway Administration. 23 C.F.R. § 646.214(b)(4).
¶ 60. The distinction alleged by Mrs. Pearson is that if one of the conditions for an active warning device such as lights and an electronic crossing gate apply, then regardless of whether federal funds were used under an approved plan, the plaintiff can show that the wrong kind of signaling device was in place. We need not, nor did we in the first appeal, determine whether expenditure of federal funds "presupposes" approval by the Secretary of Transportation in the situation when a plaintiff alleges that the crossing was the kind that seems to require an active warning device. Mrs. Pearson does not argue that this crossing required an active warning device. She admits on appeal that this is "a catchall (b)(4) case." Whatever might be necessary for preemption under subsection (b)(3), we applied case law for the preemption that arises from the expenditure of federal funds under the program for crossing upgrades. What Mrs. Pearson wants us to do is hold that installing a cross-buck under a plan approved under (b)(4) does not cause preemption because that cross-buck should be considered a minimum; until a diagnostic study is done there is no preemption. However, diagnostic studies are not even mentioned in (b)(4). What is mentioned is that the determination of a crossing device "is subject to approval of FHWA [Federal Highway Administration]." 23 C.F.R. § 646.214(b)(4). The Railway has presented unrebutted evidence of that approval.
¶ 61. We find no support for Mrs. Pearson's argument in the regulation, nor in Easterwood, Hester, or in any circuit court level case except for Shots. We have already rejected Shots as an improper and explicitly disparaging reading of the Supreme Court's interpretation of preemption in this area.
¶ 62. Thus we are on this second appeal in the same position as in the original appeal. Our pronouncements in that earlier opinion are the law of the case and have not been altered by intervening authority.

3. Evidence presented on summary judgment
¶ 63. Based upon our statement of the law on preemption, the trial court after remand received evidence on whether the crossing at which this accident occurred *406 met the requirements of that doctrine. The Railway introduced the following:
1. Affidavit that federal funds were used at this crossing as part of the federal highway program for the upgrade of highway-railroad crossings.
2. Affidavit that 90% of the funds spent on this crossing were from the federal government and 10% from the Railway.
3. Master agreement between the Railway and the State Highway Commission, setting out each crossing upgrade in Sunflower County, approved by the Federal Highway Administration.
4. Intermediate and final inspection reports for Sunflower County crossings from the Federal Highway Administration.
¶ 64. Based on this information, the trial court found that having only a cross-buck at the crossing at which this accident occurred was the result of a program for crossing upgrades, through which federal funds were expended under the Highway Safety Act. That expenditure for this crossing the court found to have been approved by the Federal Highway Administration. The court therefore granted summary judgment.
¶ 65. For Mrs. Pearson to argue that additional or different warning devices were needed, whether active or passive in nature, was challenging the federal decision as to what kind of devices should be at this crossing. That crossing by crossing, case by case, state by state second-guessing of what the federal government has done under a program regulating interstate commerce is quintessentially a violation of the preemption doctrine.
¶ 66. The trial court received the evidence that was required under our remand order. It proved the preemption of issues regarding the adequacy of the warnings. No other factual issues were raised by Mrs. Pearson after remand. Summary judgment was appropriate.
¶ 67. THE JUDGEMENT OF THE SUNFLOWER COUNTY CIRCUIT COURT IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
BRIDGES, C.J., McMILLIN and THOMAS, P.JJ., and HERRING, HINKEBEIN and PAYNE, JJ., concur.
DIAZ, J., dissents with separate written opinion, joined by COLEMAN and KING, JJ.
DIAZ, Judge, dissenting:
¶ 68. I respectfully dissent from the majority's decision to grant summary judgment to Columbus and Greenville Railway Company. Summary judgment is a powerful tool which "should be used wisely and sparingly." Martin v. Simmons, 571 So.2d 254, 258 (Miss.1990). It should only be granted when "there is no genuine issue as to any material fact." M.R.C.P. 56(c). When reviewing a decision to grant summary judgment, this Court will review the case de novo. Crain v. Cleveland Lodge 1532, 641 So.2d 1186, 1188 (Miss.1994). All evidentiary matters are viewed in a light most favorable to the non-movant. Id. (emphasis added); Morgan v. City of Ruleville, 627 So.2d 275, 277 (Miss.1993). In other words, the Columbus and Greenville Railway Company must show that there is no issue of fact concerning whether 23 C.F.R. § 646.214(b)(4) applies in this case thereby invoking federal preemption against appellant's state law claims. I believe that the railroad has not met this burden.
¶ 69. The majority opinion embraces the notion that a mere expenditure of federal funds for the installation of safety devices at railroad crossings is all that is necessary to invoke federal preemption of state law claims. However, congressional intent is the sole consideration with respect to preemption claims. California Fed. Sav. & Loan Ass'n v. Guerra, 479 U.S. 272, 280, 107 S.Ct. 683, 93 L.Ed.2d 613 (1987). Congress conveys its intent to preempt state law either expressly or by implication. City of Burbank v. Lockheed Air Terminal, *407 Inc., 411 U.S. 624, 633, 93 S.Ct. 1854, 36 L.Ed.2d 547 (1973). The 23 C.F.R. regulations establish the basic terms between federal and state government interaction concerning funding and compliance with the Federal Railway Safety Act and do not speak directly to federal preemption of state law claims but instead raise a presumption of preemption. CSX Transportation, Inc. v. Easterwood, 507 U.S. 658, 667-68, 113 S.Ct. 1732, 123 L.Ed.2d 387 (1993). Since the congressional regulations do not affirmatively indicate their effect on negligence law and a presumption against preeemption exists, I would not find federal preemption applicable in this case.
¶ 70. In this setting, state law claims are preempted when either 23 C.F.R. § 646.214(b)(3) or (4) is applicable. Easterwood, 507 U.S. at 670-71, 113 S.Ct. 1732. These provisions apply whenever "federal funds participate in the installation of the [warning] devices." Id. at 671, 113 S.Ct. 1732; Hester v. CSX Transportation, Inc., 61 F.3d 382, 386 (5th Cir.1995). However, the federal participation of funds must be "significant" which requires "more than a causal financial connection" between the project and the federal government. Armijo v. Atchison, Topeka, and Santa Fe Ry. Co., 87 F.3d 1188, 1190 (10th Cir.1996)(quoting Hatfield v. Burlington N. R.R. Co., 1 F.3d 1071, 1072 (10th Cir. 1993) (Hatfield I)). Although the court in Hester did not embrace the test of "significance" for federal fund participation in railroad crossing upgrade projects, the Armijo analysis of participation is a better reasoned approach for resolving questions of significant federal fund participation.
¶ 71. Both parties admit in their briefs that 23 C.F.R. § 646.214(b)(3) does not apply in this case. Therefore, whether preemption is proper rests on the applicability of subsection (b)(4) to the appellant's case. Although the Supreme Court's opinion in Easterwood noted that approval by the Federal Highway Administration is implicit in projects where federal funds participated in the installation of warning devices, the literal reading of this statement is not necessarily the correct one. Shots v. CSX Transportation, Inc., 38 F.3d 304, 306-07 (7th Cir.1994). The approval to upgrade railroad crossings warning devices does not presuppose a determination by the Secretary of Transportation that such devices are adequate. Shots, 38 F.3d at 307.
¶ 72. In the case sub judice, only the most casual financial connection between the federal government and this project existed. The government's participation cannot reasonably be described as significant. Furthermore, to characterize the happenstance method by which FHWA funds were approved for the passive warning devices at the railroad crossing in question is to ignore the whole point, it seems, of the Easterwood doctrine. The ultimate goal to be achieved, either through the application of state negligence law or federal regulations, is reasonable safety at grade crossings. The federal regulations identify factors to be considered and require decisions to be made, in light of those factors, regarding what type of warning device is adequate. In light of this, it makes no sense to find that the railroad has been excused from its common law duty to maintain a safe crossing simply because, without any analysis by anyone regarding what devices were required at the crossing under the federal regulatory scheme, FHWA signed off on a request for funds to install the passive warning devices at this crossing. Furthermore, a signature approving the use of federal funds is insufficient to show that a determination was made with regard to the safety at the crossing.
¶ 73. Here, the appellant claims that 23 C.F.R. § 646.214(b)(4) does not apply in this case because the federal participation in the project was not significant under Shots and Armijo and that no approval by the FHWA existed. The appellee claims that this subsection does apply because federal participation in the project was *408 significant and the Federal Highway Administration approved the project. Hence, genuine issues of material facts exist concerning whether federal funds significantly participated in the project and whether the FHWA approved it, thereby making the grant of summary judgment by the trial court improper. Therefore, I would deny the motion for summary judgment based on federal preemption of state claims and allow the appellant to pursue her case in state court.
COLEMAN and KING., JJ., join this separate opinion.
NOTES
[1] We commend the parties and the amici curiae for the thoroughness and helpfulness of the briefs submitted on preemption. We especially thank the Civil Division, United States Department of Justice, who on behalf of the United States and the Department of Transportation responded favorably to our Order of May 30, 1995 inviting their participation as amicus in this case.
[2] This act was repealed in 1994 as part of a recodification of a wide range of federal transportation laws; the substantive provisions were unchanged. See Act of July 5, 1994, Pub.L. No. 103-272, 108 Stat. 745 (1994). We will use the prior codification references in this opinion.
[3] Not all crossing upgrades are made using federal funds. According to statistics provided in the Department of Justice brief, States and railroads annually expend over $100 million on crossing improvements without federal participation.
[4] The Railway and the amici associations' briefs indicate contracts using federal funds were authorized by the Federal Highway Administration in 1981 and 1982. This is not record evidence.
[5] The regulation includes in its definition of "active warning device" "those traffic control devices activated by the approach of a train... as well as manually operated devices and crossing watchmen...." 23 C.F.R. § 646.204(j).
[6] A state may impose more stringent requirements for local hazards, but not through common law negligence actions. Negligence law "provides a general rule to all hazards caused by lack of due care, not just those owing to unique local conditions." Easterwood, 507 U.S. 658, 113 S.Ct. at 1743.