United States Court of Appeals,

Fifth Circuit.

No. 94-60506.

Alvia E. HESTER, Sr., and Brenda Hester, Individually and Brenda Hester as the Executor of the Estate of Alvia E. Hester, Jr., Deceased, Plaintiffs-Appellants,

v.

CSX TRANSPORTATION, INC., Defendant-Appellee.

Aug. 21, 1995.

Appeal from the United States District Court for the Southern District of Mississippi.

Before REAVLEY, GARWOOD and DAVIS, Circuit Judges.

GARWOOD, Circuit Judge:

Plaintiffs-appellants Alvia Hester, Sr. and Brenda Hester (the Hesters) appeal an order of the district court granting defendant-appellee CSX Transportation's (CSX) motion for reconsideration, pursuant to which the district court reinstated the jury verdict in favor of CSX. We affirm.

## Facts and Proceedings Below

On July 22, 1989, an automobile in which the Hesters' fourteen-year-old son was a passenger collided with a train operated by CSX at the Hatley Circle crossing in Orange Grove, Jackson County, Mississippi. The Hesters' son was killed in the accident. The Hesters filed a wrongful death suit against CSX in Mississippi state court; CSX removed the case to federal court on the basis of diversity of citizenship and then answered the complaint.

CSX subsequently was granted leave to amend its answer to

raise the affirmative defense of federal preemption as to the Hesters' excessive speed and inadequate signalization claims. Thereafter, CSX moved for partial summary judgment as to these aspects of the Hesters' negligence claims. On September 25, 1992, the district court granted CSX's motion, finding that both the excessive speed and inadequate signalization claims were preempted by the Federal Rail Safety Act of 1970 (FRSA), 45 U.S.C. § 421 *et seq.,* and the Highway Safety Act of 1973 (HSA), 23 U.S.C. § 130 *et seq.* Following entry of the district court's order, the Hesters moved for reconsideration and a stay of the proceedings in the case pending the Supreme Court's resolution of *CSX Transportation, Inc. v. Easterwood.* The district court denied the motion.

The case proceeded to trial on the Hesters' remaining theories of negligence.[1] The jury returned a verdict in favor of CSX, and the district court entered judgment for CSX on March 25, 1993. On April 5, 1993, the Hesters filed a motion for new trial, alleging that the district court erred in not staying proceedings until *Easterwood* had been decided and in admitting certain testimony of CSX's expert witness. On April 21, the Supreme Court issued its decision in *Easterwood.* As discussed more fully below, a crucial issue under *Easterwood* is whether federal funds have "participated"

---

[1]These theories were that the visibility at the crossing was so obstructed by vegetation as to make the crossing ultrahazardous, that the crew failed to keep a proper lookout for approaching motorists, that the train was not blowing its whistle as it approached the crossing, that the crew failed to blow the warning whistle once they spotted the car, and that the crew failed to use reasonable care in timely applying the emergency braking system once they determined that the car was not going to stop.

2

in upgrading the subject crossing; if they have, state law is preempted in certain respects. In a supplemental response to the Hesters' motion for new trial, CSX "conceded that no federal funds were actually used to upgrade the subject crossing." On June 7, 1993, the district court granted the Hesters' motion, determining that, "in the interest of justice, a new trial should be granted."

CSX then filed a motion for reconsideration of the order granting a new trial, asserting that federal funds had in fact been expended in the upgrading of Hatley Circle. The Hesters opposed this motion, and the district court held a hearing on January 27, 1994. Following the hearing, the district court directed the parties to provide further information on whether CSX had participated in diagnostic teams surveying railroad crossings in Mississippi; CSX entered a supplemental filing demonstrating that, contrary to its assertion at the January hearing, it had in fact participated in such diagnostic teams. On June 14, 1994, the district court filed an order determining that CSX had shown that it participated in diagnostic teams to prioritize railroad crossings in Mississippi for improvements and that federal funds were expended in upgrading the Hatley Circle crossing, as required by *Easterwood*. It therefore granted CSX's motion to reconsider and reinstated the original judgment. The Hesters thereafter timely appealed to this Court.

## Discussion

On appeal, the Hesters assert that the district court erred in holding that their inadequate signalization claims were preempted

3

by the Supreme Court's decision in *CSX Transportation, Inc. v. Easterwood,* --- U.S. ----, 113 S.Ct. 1732, 123 L.Ed.2d 387 (1993), arguing that CSX has not satisfied the preconditions necessary for preemption under *Easterwood.* The Hesters also claim error in the district court's admission of certain testimony of CSX's expert witness.

I. Federal Preemption of State Law Claims

In *Easterwood,* the Supreme Court considered whether the FRSA preempted the plaintiff's Georgia common law negligence claim that the railroad crossing at which her husband was killed had inadequate warning signals.[2] Under the FRSA, a state may "adopt or continue in force any law, rule, regulation, order, or standard relating to railroad safety until such time as the Secretary [of Transportation] has adopted a rule, regulation, order, or standard *covering the subject matter* of such State requirement." 45 U.S.C. § 434 (emphasis added). In 1973, Congress enacted the HSA, which

> "makes federal funds available to the States to improve grade crossings, in return for which the States must "conduct and systematically maintain a survey of all highways to identify those railroad crossings which may require ... protective devices, and establish and implement a schedule of projects for this purpose." *Easterwood,* --- U.S. at ----, 113 S.Ct. at 1737 (quoting 23 U.S.C. § 130(d)).

---

[2]Like the Hesters, the plaintiff in *Easterwood* also asserted a claim of negligence based on the train's allegedly excessive speed. The Court held that such claims were preempted by the FRSA and attendant implementing regulations. *Easterwood,* --- U.S. at ----, 113 S.Ct. at 1742-42; *but see id.* at ----, 113 S.Ct. at 1743 n. 15 (refusing to determine whether these regulations bar claims for "related tort law duties, such as the duty to slow or stop a train to avoid a specific, individual hazard"). Accordingly, the Hesters have not brought forward their excessive speed claims.

The states' eligibility for and use of federal funds is governed by regulations promulgated by the Federal Highway Administration (FHWA). *See generally* 23 C.F.R. pts. 646, 655, 924, 1204. The issue before the Court in *Easterwood* was whether these regulations "covered the subject matter" of the plaintiff's state law claims and therefore preempted those claims. *Easterwood,* --- U.S. at ----, 113 S.Ct. at 1737.

The Court noted that the use of the term "covering" in the FRSA's express preemption clause implied a restrictive view of preemption, under which "pre-emption will lie only if the federal regulations substantially subsume the subject matter of the relevant state law," and that the context of the provision, which "is both prefaced and succeeded by express saving clauses," manifested a "considerable solicitude for state law." *Id.* at ----, 113 S.Ct. at 1738. The Court thus held that general regulations that do not establish particular requirements governing the installation of warning devices at grade crossings do not cover the subject matter of state tort law and thus could not have preemptive effect.[3] *Id.* at ----, 113 S.Ct. at 1738-40.

---

[3]Specifically, the Court held that the regulations of 23 C.F.R. pt. 924, which require states receiving federal aid to establish highway safety improvement programs and set forth the parameters of such programs, did not preempt state law negligence claims against railroads because they spoke only to the duties of the state with respect to grade crossings. Given that the states and the railroads occupied historically distinct spheres of responsibility with respect to grade crossing safety and "that the regulations provide no affirmative indication of their effect on negligence law," the Court held that these regulations did not preempt state negligence law. *Easterwood,* --- U.S. at ----, 113 S.Ct. at 1739-40. Likewise, it held that the requirement that states comply with the FHWA's Manual on Uniform Traffic Control

5

The regulations set forth in 23 C.F.R. § 646.214(b)(3) and (b)(4), however, do prescribe such particular requirements.[4] The

---

Devices for Streets and Highways, *see* 23 C.F.R. §§ 646.214(b)(1), 655.603, did not cover the subject matter of state tort law because the Manual itself stated that it was intended only to establish standards for warning device installations, not legal requirements that devices be installed. *Easterwood,* --- U.S. at ----, 113 S.Ct. at 1740.

[4]Section 646.214(b)(3) states,

> "(i) *Adequate warning devices,* under § 646.214(b)(2) or on any project where Federal-aid funds participate in the installation of the devices are to include automatic gates with flashing light signals when one or more of the following conditions exist:
>
> > (A) Multiple main line railroad tracks.
> >
> > (B) Multiple tracks at or in the vicinity of the crossing which may be occupied by a train or locomotive so as to obscure the movement of another train approaching the crossing.
> >
> > (C) High Speed train operation combined with limited sign distance at either single or multiple track crossings.
> >
> > (D) A combination of high speeds and moderately high volumes of highway and railroad traffic.
> >
> > (E) Either a high volume of vehicular traffic, high number of train movements, substantial numbers of schoolbuses or trucks carrying hazardous materials, unusually restricted sight distance, continuing accident occurrences, or any combination of these conditions.
> >
> > (F) A diagnostic team recommends them.
>
> (ii) In individual cases where a diagnostic team justifies that gates are not appropriate, FHWA may find that the above requirements are not applicable."

Section 646.214(b)(4) provides,

> "For crossings where the requirements of § 646.214(b)(3) are not applicable, the type of warning device to be installed, whether the determination is

6

Court therefore held that, where applicable, these regulations *do* preempt state law:

> "[U]nder §§ 646.214(b)(3) and (4), a project for the improvement of a grade crossing must either include an automatic gate or receive FHWA approval if federal funds "participate in the installation of the [warning] devices.' Thus ... §§ 646.214(b)(3) and (4) displace state and private decisionmaking authority by establishing a federal-law requirement that certain protective devices be installed or federal approval obtained.... In short, for projects in which federal funds participate in the installation of warning devices, the Secretary has determined the devices to be installed and the means by which railroads are to participate in their selection. The Secretary's regulations therefore cover the subject matter of state law which ... seeks to impose an independent duty on a railroad to identify and/or repair dangerous crossings."[5] *Id.* at ----, 113 S.Ct. at 1741 (footnote omitted).

Pursuant to *Easterwood,* the test we thus must apply is whether federal funds "participated" in the installation of "warning devices" at the Hatley Circle crossing. If they have, the Hesters' common law claims based on inadequate signalization are preempted.

CSX presented evidence, including Mississippi Department of Transportation (MDOT) records and the affidavit of Newton

---

> made by a State regulatory agency, State highway agency, and/or the railroad, is subject to the approval of FHWA."

[5]The Court found, however, that the railroad had not established that federal funds participated in the installation of warning devices at the crossing in question. The evidence showed that, although federal funds had been set aside to install a crossing gate, the project had been stalled when the city refused to approve other necessary improvements. *Easterwood,* --- U.S. at ----, 113 S.Ct. at 1741. Although preliminary circuitry had been installed, the gate was never erected, and the federal funds were allocated to other uses. *Id.* The Court held that this evidence did not establish that federal funds participated in the installation of warning devices at the crossing; the preliminary circuitry was not a warning device under the definition of the regulations. *Id.* (citing 23 C.F.R. § 646.204(i) & (j)).

McCormick, the Office Engineer of the Construction Division of MDOT, showing that from 1981 to 1983 federal funds were approved *and expended* in the upgrading and installation of reflectorized crossbucks, advance warning signs, and advance pavement warning markings at the Hatley Circle crossing. Such passive warning devices fall within the regulations' definition of devices for which federal funds may be expended.[6] *See* 23 C.F.R. § 646.204(i).

---

[6]Of course, passive warning devices are not adequate where section 646.214(b)(3) applies, but it seems clear on the facts before us that the applicable provision is section 646.214(b)(4). The Hesters conceded in a supplemental response to CSX's motion for reconsideration that Hatley Circle was a rural crossing and that therefore subsections (A) through (E) of section 646.214(b)(3)(i) were not applicable. In addition, although CSX has adequately demonstrated that it participated in diagnostic teams to study and rank crossings for improvements, there is no record evidence indicating that such a diagnostic team made any recommendations with respect to Hatley Circle. The provisions of section 646.214(b)(3)(i)(F), which contemplates that an automatic gate may be installed if a diagnostic team so recommends, are therefore inapplicable.

Moreover, as our discussion below makes clear, the mere fact that a railroad has participated as a member of a diagnostic team to survey, rate, and rank grade crossings for future improvements is by itself insufficient to establish that federal funds participated in the improvement of the crossing; there must be an actual, authorized expenditure of federal funds in the installation or placement of safety devices at the particular crossing to trigger preemption. *See, e.g., St. Louis Southwestern Railway Co. v. Malone Freight Lines, Inc.,* 39 F.3d 864, 866-67 (8th Cir.1994) (participation occurs only when safety devices are actually installed, not when federal funds are merely earmarked for improvements), *cert. denied,* --- U.S. ----, 115 S.Ct. 1963, 131 L.Ed.2d 854 (1995); *Bowman v. Norfolk Southern Railway Co.,* 832 F.Supp. 1014, 1019 (D.S.C.1993) (finding no preemption when defendant proved only that crossing had been inspected pursuant to federal program). *But see Hatfield v. Burlington Northern Railroad Co.,* 1 F.3d 1071, 1072 (10th Cir.1993) (participation must be a "significant event," although actual installation is not necessarily required for preemption).

8

Having reviewed the record evidence, we find that CSX has established that federal funds did in fact participate in the installation of warning devices at Hatley Circle.[7]

The Hesters argue that there is no record evidence demonstrating that the Secretary made a determination that these passive warning devices were adequate to protect motorists at Hatley Circle. The statute and regulations preclude this argument. The regulations direct the Secretary to authorize the expenditure of federal funds only on projects that satisfy, *inter alia,* the requirements of federal law, specifically 23 U.S.C. § 109.[8] *See* 23 C.F.R. § 630.114(b). Under that section, "[n]o funds shall be approved for expenditure ... unless proper safety protective devices complying with safety standards *determined by the Secretary at that time as being adequate* shall be installed or be in operation at any highway and railroad grade crossing ..." 23 U.S.C.A. § 109(e) (emphasis added). The fact that federal funds participated in the installation of the warning devices legally

_____

[7]We cannot agree with the Hesters that CSX's earlier concession that no federal funds participated in the installation of the improvements at Hatley Circle creates a fact issue precluding summary judgment. The documentary evidence clearly demonstrates that federal funds did participate in the installation. There is no contrary evidence. We do not take the Hesters to be arguing that this evidence is fabricated or otherwise fraudulent.

[8]It is the Secretary's authorization that triggers the participation of federal funds. *See* 23 C.F.R. § 630.114(g) ("Federal funds shall not participate in costs incurred prior to the date of authorization to proceed."). Prior to authorization, the Secretary must approve the proposed project, but such approval "does not constitute an obligation of funds, nor establish a date of eligibility for Federal funding." *Id.* § 630.112(c).

presupposes that the Secretary approved and authorized that expenditure, which in turn legally presupposes that the Secretary determined that the safety devices installed were adequate to their task.[9] There is no evidence that this did not in fact happen. Nor is there any evidence demonstrating that passive warning devices alone were deemed inadequate (or were not found adequate) to promote safety at Hatley Circle.

We therefore conclude that federal funds participated in the installation of warning devices at Hatley Circle. The Hesters' state law claims based on inadequate signalization at the crossing are therefore preempted.

II. Expert Witness Testimony

The Hesters also allege error in the admission of certain testimony of CSX's expert witness, Dr. Glenn A. Burdick (Burdick). First, they argue that the district court committed reversible error in allowing Burdick to refer to the findings of a state-sponsored inventory of railroad crossings in Mississippi. Under federal law,

> "[R]eports, surveys, schedules, lists, or data compiled for the purpose of identifying[,] evaluating, or planning the safety enhancement of ... railway-highway crossings ... shall not be admitted into evidence in Federal or State court or considered for other purposes in any action for damages arising from any occurrence at a location mentioned or addressed in such reports, surveys, schedules, lists, or

---

[9]We note that the Seventh Circuit seems to have, at least arguably, reached a contrary conclusion in *Shots v. CSX Transportation, Inc.,* 38 F.3d 304 (7th Cir.1994). We do not know precisely what evidence was before the *Shots* court nor the full facts of that case. Nevertheless, on the facts before us here, we feel constrained by *Easterwood* to find the Hesters' claims preempted.

10

data."   23 U.S.C. § 409 (footnote omitted).
The Hesters claim that Burdick testified in violation of this prohibition when, while describing his *personal* inventory of the traffic volume at Hatley Circle, he mentioned in passing that the state inventory had determined a slightly greater volume of traffic.

We think it highly doubtful that the district court abused its discretion in admitting this testimony. *See EEOC v. Manville Sales Corp.,* 27 F.3d 1089, 1092-93 (5th Cir.1994), *cert. denied,* --- U.S. ----, 115 S.Ct. 1252, 131 L.Ed.2d 133 (1995).  The statement was made in the midst of an extended narrative outlining Burdick's personal assessment of the amount of traffic at the crossing.  This clearly distinguishes the present case from *Lusby v. Union Pacific Railroad Co.,* 4 F.3d 639 (8th Cir.1993), in which the court found reversible error when the expert's entire opinion as to the safety of the crossing was based on inadmissible inventory evidence. *Id.* at 641.  Even assuming *arguendo* that the testimony was erroneously admitted, this general, isolated, passing reference to the inventory (which did not even mention by whom the inventory had been conducted) was undoubtedly harmless.[10]

The Hesters also argue that the district court erred in allowing Burdick to evaluate a set of pictures that the Hesters had earlier entered into evidence to illustrate visibility at the

---

[10]We note too that the findings of the inventory, which found a slightly greater volume of traffic at the Hatley Circle crossing than Burdick's own inventory indicated, were actually more beneficial to the Hesters' case than CSX's.

11

Hatley Circle crossing. Burdick opined that the pictures were misleading and did not accurately depict the conditions at the crossing. The Hesters contend that this testimony was outside Burdick's designated field of expertise.[11] The admission of expert testimony is a matter committed to the district court's discretion, and we will reverse only if we find manifest error. *Rosado v. Deters,* 5 F.3d 119, 124 (5th Cir.1993).

We conclude that, on balance, the district court did not abuse its discretion in allowing Burdick's testimony in this respect. At the time of his deposition, Burdick had already analyzed and expressed an opinion as to photos of the crossing taken only a day or two after the accident that CSX had provided to him. We do not think, therefore, that the Hesters can claim that they were completely surprised by Burdick's asserted expertise in the general

---

[11]The Hesters also contend that the admission of Burdick's opinion was particularly egregious given that it was not disclosed to them until trial, thereby prejudicing their ability to adequately cross-examine Burdick. Fed.R.Civ.P. 26(a)(2)(B) provides for the discovery of facts known and opinions held by expert witnesses to be called at trial. However, if an expert's opinion is to be introduced merely to rebut the opposing party's expert's opinion, parties have thirty days from the date of disclosure of that opinion to supplement their discovery responses. Fed.R.Civ.P. 26(a)(2)(C). Under Fed.R.Civ.P. 26(a)(2)(C), supplementation of Burdick's opinion was due by March 8. Burdick's opinion was not in fact disclosed to the Hesters' counsel until the day of Burdick's testimony, March 17.

It is committed to the district court's discretion whether to sanction a party for violations of Rule 26(e)(1) by, for example, excluding expert testimony. *Bradley v. United States,* 866 F.2d 120, 124 (5th Cir.1989). In addition, the district court stated its opinion that it did not believe CSX intentionally withheld Burdick's opinion to gain an unfair advantage. This finding is not clearly erroneous. Also, for the reasons discussed herein, we do not think the district court abused its discretion.

12

field of photo analysis.[12]  Significantly, Burdick had made a personal, on-site survey of the crossing;  even a layperson may testify to the accuracy of a photograph of a scene that he has personally viewed.

Moreover, the Hesters did not object to CSX's at-trial tender of Burdick as "an expert in [the] field of accident reconstruction *with the ability to analyze photographs ...*" (emphasis added).  In addition, when counsel for CSX began to question Burdick about the photographs, counsel for the Hesters allowed his testimony to continue for several pages of transcript before objecting[13];  by that time, Burdick had already opined that the photos were inaccurate and misleading.

## Conclusion

For the foregoing reasons, the judgment of the district court is

AFFIRMED.

---

[12]The Hesters point to Burdick's direct testimony that "it would require an expert in photo analysis to identify those [the Hesters' photographs] as being of the crossing," but take the comment completely out of context.  The comment was introductory to Burdick's (unobjected to) opinion that the Hesters' photos of the crossing purporting to show that vegetation obstructed motorists' view of approaching trains were misleading.  Burdick was not stating that *he* was not properly qualified to analyze the photographs, as the Hesters imply;  immediately after making this statement, Burdick explained, "With considerable analysis, I could determine where they were taken from and in what direction the camera was pointing ..."

[13]The Hesters complain that the district court did not allow them to fully state their objection before overruling it. Considering the lateness of this objection, however, we do not think this fact is particularly relevant.