173 F.3d 386
 Dedra SHANKLIN, Individually and as Next Friend of Jessie
Guy Shanklin, Plaintiff-Appellee,
v.
NORFOLK SOUTHERN RAILWAY COMPANY, Defendant-Appellant,
Cincinnati, New Orleans & Texas Pacific Railway Company;
Norfolk Southern Corporation, Defendants.
 No. 96-6371.
 United States Court of Appeals,
Sixth Circuit.
 Argued Feb. 5, 1998.
Decided April 13, 1999.
 
 Everett B. Gibson (argued and briefed), Bateman, Gibson & Childers, Memphis, Tennessee, for Defendant-Appellant.
 Pamela R. O'Dwyer (argued and briefed), Paty, Rymer, and Ulin, Chattanooga, Tennessee, for Plaintiff-Appellee.
 Jeffrey Robert White (briefed), Washington, D.C., James Lacey O'Connell (briefed), Lindhorst & Dreidame, Cincinnati, Ohio, for Amici Curiae.
 Before: BATCHELDER, MOORE, and CLAY, Circuit Judges.
 OPINION
 BATCHELDER, Circuit Judge.
 
 
 1
 This action arises out of an accident that occurred in Gibson County, Tennessee, on October 3, 1993. Eddie Shanklin collided with, and was killed by, one of Norfolk Southern's trains while he was driving his car east across the Oakwood Church Road Crossing. Dedra Shanklin (Eddie Shanklin's widow) brought claims-based on both Tennessee common law and statutory law-alleging that the accident was the result of Norfolk Southern's negligence in: (1) operating its train at an excessive speed; (2) failing to sound the horn or apply the brakes in a timely fashion; (3) failing to remove vegetation from the area surrounding the crossing; (4) failing to install a "ditch light" on the train; and (5) failing to install adequate warning devices at the crossing.
 
 
 2
 Norfolk Southern moved for summary judgment, claiming that Shanklin's claims are preempted by the Federal Railroad Safety Act ("FRSA"), 45 U.S.C. §§ 421-447, repealed and recodified as 49 U.S.C. §§ 20101-20153. On April 17, 1996, the district court granted summary judgment to Norfolk Southern on the excessive speed and "ditch light" claims, holding that they were preempted by the FRSA and Boiler Inspection Act, respectively, but denied the motion in all other respects.
 
 
 3
 Thus, the claims concerning failure to apply the brakes, failure to sound the horn, failure to remove vegetation, and failure to install adequate warning devices went to a jury trial beginning on April 29, 1996. On May 7, 1996, the jury returned a verdict finding that Shanklin and Norfolk Southern were both guilty of negligence. The jury assigned 30% negligence to Shanklin and 70% to Norfolk Southern. The jury further found the damages to be $615,379.00. Accordingly, a judgment was entered by the district court awarding Shanklin $430,765.30.
 
 
 4
 Norfolk Southern timely filed a motion for judgment as a matter of law or, in the alternative, for a new trial. The motion was denied on September 13, 1996, and Norfolk Southern timely filed a notice of appeal on September 25, 1996.
 
 I.
 A.
 
 5
 In 1987, the Tennessee Department of Transportation ("TDOT") installed reflectorized crossbucks at the Oakwood Church Road Crossing as part of an improvement project including 196 crossings in 11 West Tennessee counties. Terry Cantrell, the TDOT employee in charge of Tennessee's railroad crossing programs, testified that the improvements at the Oakwood Church Road Crossing were undertaken as part of a federally funded "minimum protection program" to bring crossings into compliance with 23 C.F.R. § 130(d). That section mandates that a state establish a schedule of crossing safety projects and that "[a]t a minimum, such schedule shall provide signs for all railway-highway crossings." 23 U.S.C. § 130(d). No evidence was produced that any federal employee was involved in the decision to install crossbucks, as opposed to active warning devices such as gates and flashing lights, at the Oakwood Church Road Crossing.
 
 
 6
 Furthermore, evidence was introduced at trial showing that the Oakwood Church Road Crossing exhibited the following dangerous conditions: (1) high speed train operations combined with limited sight distance; (2) moderately high railroad and highway traffic; (3) trucks carrying hazardous materials; and (4) a prior collision at the crossing.
 
 B.
 
 7
 Eddie Shanklin was driving east along Oakwood Church Road at a speed of 20 miles per hour when he was struck by a Norfolk Southern train at the Oakwood Church Road Crossing. Archie Brunham, former head of the Georgia Department of Transportation, explained at trial that Shanklin did not have enough time to stop the car after seeing the train and that he was not able to hear the train whistle because his windows were rolled up, his heater fan was on, and his radio was playing. Burnham explained that in order to stop, Shanklin needed to have seen the train and to have started applying the brakes no closer than 135 feet from the tracks. Shanklin could not have seen the train until he was a mere 94 feet from the tracks, however, because of vegetation and the proximity of a house to the tracks. Indeed, the engineer of the train testified that he never saw Shanklin's vehicle prior to the accident, and the other two crew members testified that they only saw Shanklin's car after it was too late to stop.
 
 
 8
 Burnham also testified that "very possibly sight and sound of the approaching train could have been received by Shanklin at the same point in time. And as I've demonstrated earlier that point in time, 94 feet away from the rail, is just too late." When Norfolk Southern tried to rebut Burnham's horn-related testimony with an expert of their own, the results were less than stellar. Tom Rose opined that the train horn could have been heard at 400 feet, but he reached that opinion by doing tests in a car different from Shanklin's, without radio or heater on, and sitting still on a flat road in Texas. Rose played a tape recording at trial, which he expected would establish that Mr. Shanklin would have been able to hear the train horn. The demonstration, however, was not very successful. At one point, Rose apologized:
 
 
 9
 I have a little egg on my face, as you heard ... the recording, as you can tell, is terrible. It's extremely muddy. There was a malfunction, but I think you can still tell that the horn is-you can tell the horn is there sometimes and not there at others.
 
 
 10
 Expert testimony further suggested that the headlamp on the train may have been inadequate to warn Shanklin of the train's approach. Burnham pointed out how the existence of street lights along the tracks could confuse a driver into thinking that the train's headlamp was just another street light. Burnham further testified that the headlamp on Norfolk Southern's train was designed "to give indication of the illumination in front of the train as opposed to being a warning to the traffic that here comes the train."
 
 II.
 A.
 
 11
 Norfolk Southern contends that Shanklin's state law crossing warning device claim was preempted by the Federal Railroad Safety Act ("FRSA"), 49 U.S.C. § 20106 (formerly 45 U.S.C. § 434), and regulations issued under the Highway Safety Act, 23 U.S.C. § 101 et seq.
 
 
 12
 The FRSA was enacted "to promote safety in every area of railroad operations and reduce railroad-related accidents and incidents." 49 U.S.C. § 20101. As an aid to developing solutions to safety problems posed by railroad grade crossings, the FRSA provides that the Secretary of Transportation "as necessary, shall prescribe regulations and issue orders for every area of railroad safety supplementing [existing] laws and regulations." 49 U.S.C. § 20103.
 
 
 13
 Not long after enacting the FRSA, Congress enacted the Highway Safety Act of 1973, which makes federal funds available to the states to improve grade crossings. As a prerequisite to receiving federal funds, a state must "conduct and systematically maintain a survey of all highways to identify those railroad crossings which may require separation, relocation, or protective devices, and establish and implement a schedule of projects for this purpose." 23 U.S.C. § 130(d). States may have to meet other requirements, as specified by regulations promulgated by the Secretary through the Federal Highway Administration ("FHWA") under the FRSA and the Highway Safety Act. See 23 C.F.R. pts. 646, 655, 924, 1204.
 
 
 14
 The FRSA specifically provides for preemption, stating:
 
 
 15
 Laws, regulations, and orders related to railroad safety shall be nationally uniform to the extent practicable. A State may adopt or continue in force a law, regulation, or order related to railroad safety until the Secretary of Transportation prescribes a regulation or issues an order covering the subject matter of the State requirement.
 
 
 16
 49 U.S.C. § 20106.
 
 
 17
 In CSX Transportation, Inc. v. Easterwood, the Supreme Court addressed the preemptive force of the FRSA with respect to state warning device claims for accidents at grade crossings. 507 U.S. 658, 113 S.Ct. 1732, 123 L.Ed.2d 387 (1993). Very much like the present case, the plaintiff in Easterwood had been killed by one of defendant's trains at a grade crossing. Easterwood's widow brought a state tort claim for failure to maintain adequate warning devices at the crossing. The Supreme Court held that the state law claims in that case were not preempted by the FRSA.
 
 
 18
 The Easterwood Court first held that the regulations contained in 23 C.F.R. §§ 646.214(b)(3) and (4) provided the only potential sources for preemption in the circumstances of that case. Those sections apply, however, only to grade crossings in which "Federal-aid funds participate in the installation of the [warning] devices." See 23 C.F.R. §§ 646.214(b)(3) and (4). With respect to such federally funded crossings or federally funded projects to improve or create such crossings, § 646.214(b)(2) states that "the crossing shall not be opened for unrestricted use by traffic or the project accepted by the FHWA until adequate warning devices for the crossing are installed and functioning properly." 23 C.F.R. § 646.214(b)(2) (emphasis added).
 
 
 19
 Subsections (b)(3) and (4) outline the types of warnings deemed adequate for certain types of crossings. Subsection (b)(3)(i) mandates that automatic gates with flashing lights be installed at all grade crossings where one or more of the following conditions exists:
 
 
 20
 (A) Multiple main line railroad tracks.
 
 
 21
 (B) Multiple tracks at or in the vicinity of the crossing which may be occupied by a train or locomotive so as to obscure the movement of another train approaching the crossing.
 
 
 22
 (C) High Speed train operation combined with limited sight distance at either single or multiple track crossings.
 
 
 23
 (D) A combination of high speeds and moderately high volumes of highway and railroad traffic.
 
 
 24
 (E) Either a high volume of vehicular traffic, high number of train movements, substantial numbers of schoolbuses or trucks carrying hazardous materials, unusually restricted sight distance, continuing accident occurrences, or any combination of these conditions.
 
 
 25
 (F) A diagnostic team recommends them.
 
 
 26
 23 C.F.R. § 646.214(b)(3)(i). Subsection (b)(3)(ii) further provides that "[i]n individual cases where a diagnostic team justifies that gates are not appropriate, FHWA may find that the above requirements are not applicable." 23 C.F.R. § 646.214(b)(3)(ii) (emphasis added). If the requirements of (b)(3) are not applicable, then (b)(4) applies. According to subsection (b)(4), "the type of warning device to be installed, whether the determination is made by a State regulatory agency, State highway agency, and/or the railroad, is subject to the approval of FHWA." 23 C.F.R. § 646.214(b)(4) (emphasis added).
 
 
 27
 Taken together, then, subsections (b)(3) and (4) make it clear that there are only two types of crossings for which some federal funds have been used to supply warning devices: those that require active warnings, and those for which the absence of active warnings has been approved by the FHWA. In other words, a crossing must have active warning devices (e.g., automatic gates and flashing lights), unless the crossing falls under one of two exceptions: (1) a diagnostic team analyzes the crossing and determines that no active warning devices are needed, or (2) none of the dangerous conditions listed in (b)(3) exists at that crossing. If either of the exceptions applies, however, the crossing cannot be in compliance with subsection (b)(4) until the passive warnings adopted for the crossing have been approved by the FHWA. Accordingly, the Easterwood Court held that subsections (b)(3) and (4) "displace state and private decisionmaking authority by establishing a federal-law requirement that certain protective devices be installed or federal approval obtained. Indeed, [these sections] effectively set the terms under which railroads are to participate in the improvement of crossings." Easterwood, 507 U.S. at 670, 113 S.Ct. 1732.
 
 
 28
 The state law claims were not preempted in Easterwood, however, because the facts of that case failed to establish the preconditions for the application of either subsection (b)(3) or (b)(4). Specifically, the record failed to "establish that federal funds 'participate[d] in the installation of the [warning] devices.' " Id. at 672, 113 S.Ct. 1732 (brackets in original). State law is preempted only if either subsection (b)(3) or (b)(4) applies, and those subsections apply only if federal funds participated in the installation of warning devices at a particular crossing. Because federal funding was absent in Easterwood, the state law claim was not preempted.
 
 
 29
 Courts have not uniformly interpreted the holding in Easterwood. The Fifth, Eighth, and Tenth Circuits have each interpreted Easterwood to hold that federal funding is both a necessary and a sufficient condition for the preemption of state law. See Armijo v. Atchison, Topeka and Santa Fe Ry. Co., 87 F.3d 1188, 1190 (10th Cir.1996) ("In light of Easterwood ... the issue in this case is whether federal funds participated in some significant way in the installation of warning devices at [a particular] crossing before ... the date of the accident."); Hester v. CSX Transp., Inc., 61 F.3d 382, 386 (5th Cir.1995) ("Pursuant to Easterwood, the test we must apply is whether federal funds 'participated' in the installation of 'warning devices' at the ... crossing. If they have, the ... common law claims based on inadequate signalization are preempted."); Elrod v. Burlington Northern R. Co., 68 F.3d 241, 244 (8th Cir.1995) ("Federal funding is the touchstone of preemption in this area because it indicates that the warning devices have been deemed adequate by federal regulators."). Although Hester and Elrod dealt with (b)(4), rather than (b)(3) crossings, the opinions in those cases leave little room for doubt that the analysis would be the same in (b)(3) cases. Put simply, these circuits find that preemption analysis begins and ends with the federal funding question.
 
 
 30
 The Seventh Circuit, on the other hand, has interpreted Easterwood to hold that preemption analysis begins, but does not end, with the federal funding issue. See Shots v. CSX Transp., 38 F.3d 304 (7th Cir.1994). The Shots Court framed the discussion by first asking "what if anything more must be shown besides federal financial assistance to knock out a state common law or statutory safety requirement for grade crossings...." Id. at 305. Judge Posner, writing for the Seventh Circuit in Shots, found it significant that the Easterwood Court never got around to enumerating additional requirements for preemption, because the threshold requirement, federal funding, was absent in that case. Id. at 307. Judge Posner correctly noted that there is a difference between holding that federal funding is a necessary condition to preemption and holding that federal funding is a sufficient condition. Id.
 
 
 31
 Despite reaching different conclusions, the courts interpreting Easterwood have all focused on the same passage from that opinion:
 
 
 32
 In either case [ (b)(3) or (b)(4) ], the Secretary has determined that the railroads shall not be made to pay any portion of installation costs. In short, for projects in which federal funds participate in the installation of warning devices, the Secretary has determined the devices to be installed and the means by which railroads are to participate in their selection. The Secretary's regulations therefore cover the subject matter of state law which ... seeks to impose an independent duty on a railroad to identify and/or repair dangerous crossings.
 
 
 33
 Easterwood, 507 U.S. at 671, 113 S.Ct. 1732 (internal citation omitted). See Shots, 38 F.3d at 306-07 (quoting the above passage as critical to understanding of the holding in Easterwood ); Hester, 61 F.3d at 386 (same); Elrod, 68 F.3d at 243-44 (citing the page from Easterwood, but not quoting the passage; also citing to the discussion of that passage in Hester ); Armijo, 87 F.3d at 1190 (citing the page from Easterwood, but not quoting the passage).
 
 
 34
 Based on this language from Easterwood, the Fifth, Eighth, and Tenth Circuits all agree that "the Secretary of Transportation's authorization of passive warning devices was tantamount to a determination ... that only passive, rather than active, warning devices were sufficient." Armijo, 87 F.3d at 1190. These courts reason that federal law preempts state law at a particular crossing once the Secretary has made a determination of the kinds of warning devices that are needed at that crossing. Federal funding is merely a proxy for such a determination; i.e., federal funding equals a constructive determination by the Secretary that the types of devices being funded are adequate for the crossing being funded. Once devices for which there is any federal funding have been installed, the argument goes, state law ceases to apply. As the Hester Court put it, "The fact that federal funds participated in the installation of the warning devices legally presupposes that the Secretary approved and authorized that expenditure, which in turn legally presupposes that the Secretary determined that the safety devices being installed were adequate to their task." 61 F.3d at 387.
 
 
 35
 With respect to the same passage from Easterwood, however, the Seventh Circuit stated:
 
 
 36
 Read literally, as a blanket statement that the regulation prescribes the safety devices for all crossings at which federal funds have been used for the installation of some safety device, this passage supports the railroad's position. But we do not think the literal reading is the correct one. The regulation does not specify particular safety devices at particular crossings. Rather, it establishes criteria for determining which safety devices are required at particular crossings. Because the Supreme Court in Easterwood found that federal funds had not participated in the project at issue in that case, it had no occasion to consider the application of the regulation to particular crossings.
 
 
 37
 Shots, 38 F.3d at 307. According to the Seventh Circuit, therefore, the issue in Easterwood "was whether the regulation was applicable by virtue of federal financial participation, not whether the regulation, if applicable, actually prescribed a particular safety device at a particular crossing." Id.
 
 
 38
 Despite establishing that federal funds had participated in the installation of reflectorized crossbucks at the crossing at issue in that case, the Shots Court found that the Secretary had not made a determination that reflectorized crossbucks were adequate for that particular crossing. Rather, the crossbucks had been installed as a result of an agreement between the State of Indiana and the Secretary of Transportation to place reflectorized crossbucks at 2,638 crossings that either lacked crossbucks altogether, or lacked the more effective, reflectorized variety. Shots, 38 F.3d at 306. This agreement to bring all the crossings in Indiana up to a minimum safety level was not the same as a determination by the Secretary that one particular crossing, out of the 2,638 covered, was adequately protected by nothing more than the minimum. As Judge Posner pointed out:
 
 
 39
 Minimum is not a synonym for optimum, or even adequate.... The task was to maximize grade-crossing safety in the state as a whole, subject to a budget constraint, so it was to be expected that adequate safety might be sacrificed at some crossings to enable minimum safety to be achieved at all.... [Thus,] the agreement was a step on the road to adequate safety rather than a determination by the State of Indiana or the federal Secretary of Transportation as to what safety devices would be adequate at each of the thousands of crossings covered by it.
 
 
 40
 Id. at 308-09.
 
 
 41
 Thus, the Seventh Circuit in Shots announced a two-part test for preemption in grade crossing cases: (1) establish whether subsection (b)(3) or (4) applies at all (i.e., whether federal funding participated in the installation of warning devices at the crossing in question); and (2) establish whether the Secretary or one of his agents actually determined that active warnings were needed pursuant to (b)(3) or that only passive warnings were needed pursuant to (b)(4). In other words, a court must first establish that (b)(3) and (b)(4) are applicable, and then establish that either (b)(3) or (b)(4) was, in fact, applied.
 
 
 42
 Although alone among circuit courts, the Seventh Circuit is not the only federal court to refuse to accept the fiction of constructive approval; that is, the fiction that federal funding is the equivalent of a determination that the devices being funded are adequate protection at a particular crossing. In Heizelman v. Southern Pacific Transportation Co., the District of Oregon adopted the findings and recommendation of the magistrate judge, who had explained:
 
 
 43
 To characterize the happenstance method by which FHWA funds were approved for the [safety measures in question] as an act which triggered preemption is to ignore, it seems, the whole point of the Easterwood doctrine.... [I]t makes no sense to find that the railroad has been excused from its common law duty to maintain safe crossings simply because, without any analysis by anyone regarding what devices were required at [the particular crossing] under the federal regulatory scheme, FHWA signed off on a request for funds, a portion of which came to be applied to defray the cost to the county of installing these [safety measures].
 
 
 44
 Heizelman v. Southern Pac. Transp. Co., Case No. 91-6134-TC, Findings and Recommendation of the Magistrate Judge, slip op. at * 8-* 9 (D.Or. Dec. 9, 1993). According to the Heizelman Court, "[t]he key point is that there must be an evaluation of the adequacy of the warning devices in place at a crossing under both subsections (b)(3) and (b)(4) before preemption applies." Heizelman v. Southern Pacific Transportation Co., Case No. 91-6134-TC, Order of the District Court, slip op. at * 7 (D. Or. June 8, 1994).
 
 
 45
 The vital difference between the approach adopted by the Fifth, Eighth, and Tenth Circuits and that adopted by the Seventh Circuit is that the former accepts the doctrine of constructive approval, while the latter rejects it. The fiction of constructive approval, noted Judge Posner, is not only unrealistic, but unwise:
 
 
 46
 Indeed, it would have been an extraordinary act of irresponsibility for the Secretary of Transportation, by approving the agreement, to preclude tort liability for the railroad's failing to have active warnings at any of the thousands of crossings covered by the agreement, or otherwise to prevent the state from requiring adequate safety devices at the busiest or most dangerous of these crossings, when no one in the federal government had made a determination that the improvements to be made would bring all the crossings up to a level of safety adequate to satisfy federal standards.
 
 
 47
 Shots, 38 F.3d at 309.
 
 
 48
 For the reasons that follow, we agree with the Seventh Circuit.
 
 
 49
 According to the Supreme Court, preemption analysis must "start with the assumption that the historic police powers of the States [were] not to be superseded by [the] Federal Act unless that [was] the clear and manifest purpose of Congress." Cipollone v. Liggett Group, Inc., 505 U.S. 504, 516, 112 S.Ct. 2608, 120 L.Ed.2d 407 (1992) (quoting Rice v. Santa Fe Elevator Corp., 331 U.S. 218, 230, 67 S.Ct. 1146, 91 L.Ed. 1447 (1947)). The doctrines of federalism and judicial restraint both counsel courts against lightly casting aside the "basic assumption that Congress did not intend to displace state tort law." Maryland v. Louisiana, 451 U.S. 725, 746, 101 S.Ct. 2114, 68 L.Ed.2d 576 (1981). Moreover, "the regulation of health and safety matters is, primarily and historically, a matter of local concern." Hillsborough County v. Automated Med. Lab., Inc., 471 U.S. 707, 719, 105 S.Ct. 2371, 85 L.Ed.2d 714 (1985). Thus, the presumption against federal preemption of state law is "particularly apt" in the area of railroad safety. Rogers v. Consolidated Rail Corp., 948 F.2d 858, 859 (2d Cir.1991). Indeed, the Easterwood Court, itself, noted "the relatively stringent standard set by the language of [the FRSA's preemption clause] and the presumption against pre-emption...." Easterwood, 507 U.S. at 668, 113 S.Ct. 1732.
 
 
 50
 The presumption against preemption looms even larger in the present context, where no analogous federal remedy exists. See, e.g., Silkwood v. Kerr-McGee Corp., 464 U.S. 238, 251, 104 S.Ct. 615, 78 L.Ed.2d 443 (1984) ("It is difficult to believe that Congress would, without comment, remove all means of judicial recourse for those injured by illegal conduct."). In a case such as this one, a finding of preemption relieves the railroad of any responsibility for the types of warning devices at a particular crossing (or set of crossings). Removing responsibility from the railroad is appropriate in cases where the federal government has assumed responsibility by stepping in and making its own determination, but interpreting Easterwood too broadly (i.e., finding preemption prematurely) will remove responsibility from the railroads before the federal government has stepped in. In that case, no one is responsible for the safety of the motorists who use the crossing; we find in the FRSA no clear intent to achieve such an effect.
 
 
 51
 Of course, the Supreme Court has already determined that the FRSA can and does preempt state law, where applicable, and this Court is bound by that determination. The Supreme Court did not, however, determine the preclusive effect of the FRSA in cases, such as the present one, where the record establishes nothing more than the bare fact that federal funding participated in the installation of warning devices at a particular crossing. It is appropriate, therefore, that this Court bear in mind both the strong presumption against preemption and the mandate that, even where Congress has explicitly provided for preemption, courts should adopt "a narrow interpretation of such an express command...." Medtronic, Inc., v. Lohr, 518 U.S. 470, 485, 116 S.Ct. 2240, 135 L.Ed.2d 700 (1996).
 
 
 52
 The Seventh Circuit's more reasoned (and more reasonable) approach succeeds on this score, while the approach of the other circuits fails. The Seventh Circuit's narrow approach limits federal preemption in grade crossing cases to only those instances where federal regulatory authority has been exercised. The more expansive approach of the other circuits turns any decision to spend federal money on railroad warning devices into an eradication of state sovereignty, regardless of how or why the decision was made.
 
 
 53
 In addition to being in harmony with the presumption against preemption, the narrow approach is more faithful to the Supreme Court's holding in Easterwood. We think it is illogical to read Easterwood, as the Fifth, Eighth, and Tenth Circuits have done, for the broad proposition that state law is preempted whenever and wherever federal funding has participated in the installation of railroad devices, because the holding in that case did not begin to go so far. Indeed, the Supreme Court never reached the issue because there was no evidence in that case of federal funding.
 
 
 54
 Moreover, the narrow approach is more consistent with the FRSA's goals of promoting railroad safety, reducing railroad accidents, and reducing deaths and injuries as a result of such accidents. As Judge Posner noted in Shots, focusing on federal funding as the only criterion for preemption would, in many cases, have the effect of removing the protections of state law from large numbers of crossings which have not yet been analyzed in accordance with subsections (b)(3) and (4). These subsections set up specific guidelines for the installation of warning devices at grade crossings-guidelines which, if followed, should lead to safer crossings and fewer accidents.
 
 
 55
 Subsections (b)(3) and (4) embody a system of incentives designed to increase safety at grade crossings. In exchange for improving warning devices at a particular crossing, the states get federal funding for the improvement and the railroad (in addition to having the improvement underwritten by a state request for federal money) receives immunity from state tort actions related to that crossing. In effect, the railroads get a huge benefit if they work with the state to take the desired action. As evidenced by the Amicus Brief filed by the American Association of Railroads ("AAR"), immunity from state tort actions is no small prize. Under the narrow approach announced by the Seventh Circuit, railroads receive that prize only if they have, in fact, taken the desired action. Under the expansive approach, however, railroads get the prize whether or not they have taken the desired action. It takes nothing more than a rudimentary understanding of economics to see that an incentive-based system does not work unless the reward is somehow tied to performance of the desired action.
 
 
 56
 This is not to say that the expansive approach lacks any redeeming value. Brightline rules are both easier to understand and easier to administer. Moreover, the expansive approach would likely reduce the number of warning device tort claims, to the relief of overloaded state courts and the dismay of personal injury lawyers. One need look no further than the Amicus Brief of the American Association of Trial Lawyers to see how important the preemption issue is to personal injury lawyers.
 
 
 57
 Norfolk Southern and Amicus AAR present several other arguments in favor of preemption. First, they argue that the fiction of constructive approval is statutorily mandated by 23 U.S.C. § 109 and 23 C.F.R. § 630.114(b) (1996) (amended and recodified at 23 C.F.R. § 630.106(a) (effective Feb. 14, 1997)). Section 109(e) provides that "[n]o funds shall be approved for expenditure ... unless proper safety protective devices complying with the standards determined by the Secretary at that time as being adequate shall be installed or be in operation at any highway and railroad crossing...." 23 U.S.C. § 109(e). Section 630.114(b) states that "FHWA issuance of an authorization to proceed with the work on any phase of a highway project ... can be given only after applicable prerequisite requirements of Federal laws, and implementing regulations and directives have been satisfied." 23 C.F.R. § 630.114(b).
 
 
 58
 From these two sources, Norfolk Southern and AAR argue that any approval of federal funding for grade crossing improvement is tantamount to a decision that the improvement being made is adequate to protect against the risk at a particular crossing; hence, state law claims are preempted. Although the cited provisions may demonstrate that the TDOT program was not carried out in compliance with applicable law, these provisions do little more than reiterate the requirements of 23 C.F.R. §§ 646.214(b)(3) and (4). They do not require us to accept the fiction of constructive approval, and we decline to do so.
 
 
 59
 Norfolk Southern further argues that railroads will be unable to meet the burden of proof required by the narrow approach. It is well established that the party seeking shelter under the umbrella of preemption bears the burden of showing that preemption applies. See Silkwood v. Kerr-McGee Corp., 464 U.S. at 255, 104 S.Ct. 615 (holding that the "burden is on the party claiming preemption to demonstrate its existence"); Easterwood, 507 U.S. at 670, 113 S.Ct. 1732 ("[P]etitioner has failed to establish that the regulations apply to these cases, and hence we find respondent's grade crossing claim is not pre-empted."). According to Norfolk Southern, the narrow approach would require a railroad to show first that the crossing without active warning devices was federally funded and then that a diagnostic team had determined that active warnings were unnecessary.
 
 
 60
 Such a showing would be impossible, argues Norfolk Southern, because 23 U.S.C. § 409 prohibits the discovery of or admission into evidence of "reports, surveys, schedules, lists, or data compiled or collected for the purpose of identifying[,] evaluating, or planning the safety enhancement of ... railway-highway crossings, pursuant to sections 130, 144, and 152 of this title or for the purpose of developing any highway safety construction improvement project which may be implemented utilizing Federal-aid highway funds...." 23 U.S.C. § 409 (footnote omitted). Apparently, this provision was designed "to foster the free flow of safety-related information between the railroad industry and its regulatory bodies by precluding the possibility that such information would be discoverable and admissible in civil suits." Sawyer v. Illinois Cent. Gulf R. Co., 606 So.2d 1069, 1073 (Miss.1992) (citation omitted). See also Claspill v. Missouri Pac. R. Co., 793 S.W.2d 139, (Mo.), cert. denied 498 U.S. 984, 111 S.Ct. 517, 112 L.Ed.2d 529 (1990); Miguez v. Southern Pac. Transp. Co., 645 So.2d 1184 (La.Ct.App.1994).
 
 
 61
 The narrow approach is unworkable, the argument goes, because § 409 renders it impossible for a railroad to demonstrate that a diagnostic team determined active warnings to be unnecessary at a crossing where (b)(3) conditions exist. Yet, railroads need not depend on diagnostic team reports at all. Subsections (b)(3) and (4) unambiguously require FHWA approval for any crossing that does not have active warnings. The reason for the absence of active warnings-i.e., either the dangerous (b)(3) conditions do not exist, or such dangerous conditions do exist, but a diagnostic team has determined active warnings to be unnecessary-is quite irrelevant. Either subsection (b)(3) is applicable, in which case active warnings are required, or it is not applicable, in which case FHWA approval is required.
 
 
 62
 We conclude that Norfolk Southern misreads the requirements of § 409. As we have noted above, that section, in pertinent part, prohibits discovery and admission into evidence of "reports, surveys, schedules, lists, or data compiled or collected ... pursuant to sections 130, 144, and 152 of this title...." 23 U.S.C. § 409. Section 130, dealing with payment of costs of railway-highway crossings, among other things requires the state to conduct particular surveys, see 23 U.S.C. § 130(d); to establish and implement particular schedules, see id.; and to make annual reports which include lists and compilation and analysis of data, see 23 U.S.C. § 130(g). Section 144, dealing with highway bridge replacement programs, among other things requires the Secretary, in conjunction with the states, to inventory and classify bridges, see 23 U.S.C. § 144(b), and requires the Secretary to submit to Congress biennially his report inventorying and classifying the bridges, see 23 U.S.C. § 144(i). Section 152, dealing with elimination of highway hazards, among other things requires each state to conduct engineering surveys of public roads and to establish and implement schedules of projects for their improvement, see 23 U.S.C. § 152(a); and to submit an annual report to the Congress on the progress being made to eliminate highway hazards, see 23 U.S.C. § 152(g). This annual report is required to contain compilations and analysis of extensive data, and is the basis for the annual report that the Secretary of Transportation must file with the Congress. See id. Section 409 explicitly prohibits these "reports, surveys, schedules, lists, or data compiled or collected" from being discovered and admitted into evidence. Section 409 does not, however, mention the Secretary's approval of any project as to which these "reports, surveys, schedules, lists, or data" have been "compiled or collected," although both §§ 144 and 152 explicitly provide for the Secretary to issue approvals for these projects, see 23 U.S.C. §§ 144(d) and (k) and 152(b). We are satisfied that the FWHA's approval, i.e., the approval of the Secretary or his agent, of the use of passive warning devices at a particular crossing is not barred from discovery or admission into evidence by § 409.
 
 
 63
 In order for preemption to apply, Norfolk Southern was required to demonstrate that either subsection (b)(3) or (b)(4) was applied to the Oakwood Church Road Crossing. Because the crossing had passive, rather than active, warnings, Norfolk Southern was forced to demonstrate the application of (b)(4). In order to do so, however, Norfolk Southern needed to show that the FHWA approved passive warnings at the Oakwood Church Road Crossing. Norfolk Southern failed to do so, because, as we have held, federal funding alone is insufficient to make such a showing.
 
 
 64
 For these reasons, we AFFIRM the lower court's decision that federal law does not preempt Shanklin's state law negligence claim for failure to maintain adequate warning devices.
 
 B.
 
 65
 In addition to arguing that Shanklin's claims are preempted by the FRSA, Norfolk Southern contends that the evidence failed, as a matter of law, to establish Shanklin's right to recover. The evidence was insufficient, argues Norfolk Southern, in that it failed to establish that Shanklin's comparative fault was less than its own. Under Tennessee law, a plaintiff may recover if his negligence is less than that of the defendant, but not if his negligence equals or exceeds that of defendant.
 
 
 66
 In a state law action in which diversity forms the basis for federal jurisdiction, this Court looks to the state law to determine the standard under which to review a motion for a directed verdict. See Miller's Bottled Gas, Inc. v. Borg-Warner Corp., 56 F.3d 726, 733 (6th Cir.1995); Engebretsen v. Fairchild Aircraft Corp., 21 F.3d 721, 726 (6th Cir.1994). This case is governed by the laws of Tennessee. Under Tennessee law, a motion for judgment as a matter of law may be granted only if the court, after construing the evidence most strongly in favor of the non-movant and discarding all countervailing evidence, determines that reasonable minds could not differ as to the conclusions to be drawn from the evidence, and those conclusions are adverse to the non-movant. Eaton v. McLain, 891 S.W.2d 587, 590 (Tenn.1994). "If there is any doubt as to the proper conclusion to be drawn from the evidence, the motion must be denied." Id. In other words, Norfolk Southern will win on this issue only if the evidence is such that there is no way that a reasonable jury could have found in Shanklin's favor. This is an exceptionally heavy burden, and Norfolk Southern fails to carry it.
 
 
 67
 Norfolk Southern contends that the only conclusion reasonable minds could have reached in this case is that Shanklin was at least as negligent as Norfolk Southern, or that Norfolk Southern was not negligent at all. Specifically, Norfolk Southern claims that Shanklin (1) should have seen the train coming, (2) should have heard the whistle blowing, and, therefore, (3) should have yielded the right of way as required by Tennessee law.
 
 
 68
 Evidence was presented at trial that Shanklin could have had an unobstructed view of the train when he was 85 feet from the crossing, thus giving him a mere 2.7 seconds in which to stop the car and avoid the collision. Moreover, there was extensive expert testimony that the limited sight distance caused by vegetation, terrain, and the proximity of a house created a "trap" which made it impossible for Shanklin to see the train in time to avoid the collision. Experts also testified that the train's headlamp was inadequate because it pointed straight down the track, rather than at an angle that would provide warning to a person approaching the crossing. There was also testimony that the headlamp could be confused with an ordinary street light if seen at night. Indeed, the engineer of the train testified that he never saw Shanklin's vehicle prior to the accident, and the other two crew members testified that they only saw Shanklin's car when it was too late to stop.
 
 
 69
 As for Shanklin's ability to hear the train, the record shows that he had his heater fan on, his car windows up, and his radio playing. Norfolk Southern chose to use at trial a taped recording of the train's whistle to demonstrate that Shanklin could have heard the train. The jury could not hear the whistle, despite the fact that the tape was made in a car without the radio or heater fan on while the car was sitting still. Norfolk Southern did not give the jury much to help it arrive at the conclusion Norfolk Southern now claims is inescapable.
 
 
 70
 Although no direct evidence was presented about the precautions taken by Shanklin as he approached the crossing, the record did establish that he was driving a mere 20 miles per hour. This, combined with the evidence about his inability to see and hear the train, makes it quite clear that reasonable minds could differ as to whether and to what extent Shanklin was negligent. So, too, reasonable minds could differ about whether and to what extent Norfolk Southern was negligent. Under these circumstances-looking at the evidence in the light most favorable to Shanklin and discarding all countervailing evidence-we cannot say that reasonable minds could not differ regarding the amount of negligence of both Shanklin and Norfolk Southern.
 
 CONCLUSION
 
 71
 For the reasons stated above, the decision of the district court is AFFIRMED in all respects.